**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| LAURA "LAURIE" OBERGEFELL | : | Case No: _____ |
| 1201 Laguna Drive | | |
| Huron, Ohio 45342 | : | |
| | | |
| Plaintiff, | : | |
| | | |
| v. | : | |
| | : | |
| FIRELANDS REGIONAL MEDICAL CENTER | : | **COMPLAINT FOR AGE** |
| Statutory Agent: | | **DISCRIMINATION,** |
| Daniel J. Moncher | : | **AIDING AND ABETTING** |
| 1111 Hayes Avenue | | **DISCRIMINATION,** |
| Sandusky, Ohio 44870, | : | **WRONGFUL DISCHARGE,** |
| | | **AND WORKPLACE TORTS** |
| TONIA M. COPSEY | : | **WITH JURY DEMAND** |
| Nurse Director and Nurse Practitioner, | | |
| Wound Care Department | : | |
| Firelands Regional Medical Center | | |
| 1111 Hayes Avenue | : | |
| Sandusky, Ohio 44870, | | |
| | : | |
| JENNA MOLNAR | | |
| Firelands Regional Medical Center | : | |
| 1111 Hayes Avenue | | |
| Sandusky, Ohio 44870, | : | |
| | | |
| PATTY MARTIN | : | |
| Vice President of Quality and | | |
| Patient Satisfaction | : | |
| Firelands Regional Medical Center | | |
| 1111 Hayes Avenue | : | |
| Sandusky, Ohio 44870, | | |
| | : | |
| DENISE PARRISH | | |
| Vice President, Patient Care Services | : | |
| & Chief Nursing Officer | | |
| Firelands Regional Medical Center | : | |
| 1111 Hayes Avenue | | |
| Sandusky, Ohio 44870, | : | |

1

|                                               |   |
|-----------------------------------------------|---|
|                                               | : |
| JODY MEISLER-MCKILLIPS                         |   |
| Senior Director, Human Resources              | : |
| Firelands Regional Medical Center             |   |
| 1111 Hayes Avenue                             | : |
| Sandusky, Ohio 44870,                         |   |
|                                               |   |
| ROBERT M. MOORE                               | : |
| Executive Vice President and                  |   |
| General Counsel                               | : |
| Firelands Regional Medical Center             |   |
| 1111 Hayes Avenue                             | : |
| Sandusky, Ohio 44870,                         |   |
|                                               | : |
|              and                              |   |
|                                               | : |
| JEREMY NORMINGTON - SLAY                       |   |
| President & Chief Executive Officer           | : |
| Firelands Regional Medical Center             |   |
| 1111 Hayes Avenue                             | : |
| Sandusky, Ohio 44870                          |   |
|                                               | : |
|              Defendants.                      |   |

Plaintiff Laura "Lori" Obergefell ("Ms. Obergefell") for her Complaint against Firelands Regional Medical Center ("FRMC"), Tonia Copsey, Jenna Molnar, Patty Martin, Denise Parrish, Jody Meisler-McKillips, Robert Moore, and Jeremy Normington-Slay alleges as follows:

**THE PARTIES**

1.      Firelands Regional Medical Center ("FRMC") is Erie County's largest and most comprehensive resource for medical care. Resulting from the consolidation of what once were three separate hospitals serving the area, Firelands Regional Medical Center now serves as the only full-service medical center in Erie County. Firelands Regional Medical Center is locally managed and governed as a not-for-profit healthcare facility.

2.      Tonia Copsey is FRMC's Nurse Director and a Nurse Practitioner in the Wound Care Department. Ms. Copsey was Ms. Obergefell's immediate supervisor at the time of her abrupt termination. Ms. Copsey reports to Patty Martin, Vice President of Quality and

2

Patient Satisfaction.

3.    Jenna Molnar is the younger Nurse Practitioner whom Ms. Copsey hired to replace Ms. Obergefell.

4.    Patty Martin is the Vice President of Quality and Patient Satisfaction Firelands Regional Medical Center.

5.    Denise Parrish is FRMC's Executive Vice president, Patient Care Services & Chief Nursing Officer.

6.    Jody Meisler-McKillips is FRMC's Senior Director, Human Resources.

7.    Robert M. Moore is FRMC's Executive Vice President of Legal Services and General Counsel.

8.    Jeremy Normington-Slay is FRMC's President and Chief Executive Officer.

**JURISDICTION AND VENUE**

9.    This Court has federal question jurisdiction to hear this case because it arises under the laws of the United States.

10.    Mr. Obergefell's First Cause of Action arises under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. § 621 et. seq.

11.    Ms. Obergefell's Second Cause of Action arises under Ohio Revised Code ("R.C.") § 4112.02 (J).

12.     Ms. Obergefell's Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action arise under Ohio common law.

13.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Ms. Obergefell's state law claims because they are so related to the federal claim, over which this Court has original jurisdiction, that they form part of the same case or controversy.

14.     Venue is proper in the Northern District of Ohio, Western Division, pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Ms. Obergefell's claims occurred in Sandusky, Ohio located in the Northern District of Ohio, Western Division.

## STATEMENT OF THE FACTS

### During her career at FRMC, Ms. Obergefell received excellent performance reviews and was never disciplined

15.     Ms. Obergefell is a 58 year old (DOB November 26, 1961) Nurse Practitioner who started working as the only Nurse Practitioner in FRMC's Wound Care Department on January 21, 2008.

16.     Subsequently, FRMC promoted Tonia Copsey as the Director of the Wound Care Department and she became Ms. Obergefell's immediate supervisor.

17.     From 2010 up until 2019, Ms. Copsey gave Ms. Obergefell an annual performance and always rated Ms. Obergefell's overall job performance as "exceeds expectations." Based on her excellent performance reviews, Ms. Obergefell received a merit pay increase every year of her employment.

18.     In Ms. Obergefell's 2018 annual performance review for 2018, Ms. Copsey made the following favorable comments about Ms. Obergefell: "**Laurie continues to be a valued**

4

team member of the wound care department as well as the entire Firelands organization.

She has worked through the significant changes that Meditech has brought to our documentation with ease. Laurie strives to have the best possible outcomes for her patients and this is evidenced by her referrals to the appropriate entities when needed and utilizing resources to meet needs of the individual patient. Thank you for another year of hard work and dedication."

19.     In Ms. Obergefell's 2019 annual performance review, Ms. Copsey said that **"Laurie is an expert in her role within our wound care program."** Ms. Copsey also once again stated that **"Laurie … continues to be a valued team member of the wound care department as well as the Firelands organization."**

20.     Ms. Copsey never issued any informal or formal disciplinary action against Ms. Obergefell.

**During the time Ms. Copsey held management positions in the Wound Care Department she has shown that she is biased against older employees**

21.     In 2008, Ms. Copsey became the Case Manager. She made derogatory age comments about LPN Susan Pumphrey (who was in her 50's) saying that she was "too old" and "not fast enough." Ms. Copsey also devised a plan to get rid of Ms. Pumphrey and another older LPN, Linda Burkett ("Codi") (who was also in her 50's) under the guise that she wanted to make the Wound Care Department an all RN staff. Ms. Copsey told the two LPN's that they had a choice: they could keep their jobs if they went back to RN school and got their degrees, or they could transfer to another hospital department that still used LPNs. Ms. Copsey's plan worked because Ms. Pumphrey accepted a position in the office of another department and Ms. Burkett accepted a position in the Psych Department.

22.     In 2013 Ms. Copsey became a Nurse Practitioner ("NP") and convinced the hospital to permit her to keep her Director position and work as an NP. Consequently, Ms. Copsey reduced the number of patients Ms. Obergefell saw.

23.     After Ms. Copsey assumed her dual roles, she needed to replace RN Erica Sharkey who had resigned from her full time position. Ms. Copsey decided to change the position to a part time position and posted the new job. Although there were three RN's that could have accepted the position, Ms. Copsey made it known that she did not want to hire Sharon Cardbury (who was approximately 60) because she was "too slow" and "was going to retire soon."

24.     Ms. Copsey found another job for RN Jill Wagner (in her 50's) because she "was slower and repeatedly asked the same questions " which infuriated her.

25.     In January, 2020 Ms. Copsey got rid of RN Erica Sharkey (age 42) in retaliation for Erica filing a complaint against Ms. Copsey with Human Resources. In her complaint, Ms. Sharkey complained about Ms. Copsey's mistreatment of employees in the Wound Care Department over the years. Subsequently, Jody Meisler-McKillips, Senior Director, Human Resources met with all of the Wound Care Department employees and asked them if they had any concerns about Ms. Copsey. Because Office Coordinator/Secretary Holly Clayman - Ms. Copsey's Department spy and confidant - no one felt comfortable raising their concerns. Shortly thereafter, Ms. Sharkey was placed on leave and was then given the option to resign or be terminated. She resigned.

**Starting in 2016, Ms. Copsey repeatedly told Ms. Obergefell that she was going to hire Jenna Molnar as her replacement to get ready for her retirement, even though Ms. Obergefell had no plans to retire**

6

26.     In 2016, Ms. Copsey created a part time PRN position for her friend Jenna Molnar (age 29).

27.     Shortly thereafter, Ms. Molnar decided to go to Nurse Practitioner ("NP") school.

28.     After Ms. Molar started NP school, Ms. Copsey made it known that after Ms. Molnar finished school, she was going to hire her as an NP in the Wound Care Department.

29.     When Ms. Obergefell asked Ms. Copsey how the Wound Care Department could support three NPs, Ms. Copsey initially responded that she had big plans to grow the Department and that Ms. Obergefell **"would still have a job."**

30.     **However, Ms. Copsey later changed her explanation for her plans for the Department by telling Ms. Obergefell that she was going to hire Jenna Molnar so that she could replace Ms. Obergefell when she retired.**

31.     Every time Ms. Copsey explained her plan to hire Ms. Molnar to replace her, Ms. Obergefell made it clear to Ms. Copsey that she had no plans to retire in the near future because her husband was planning to retire from his EMT position soon and she was her family's primary breadwinner. In response to Ms. Obergefell's concern about her job security, Ms. Copsey told Ms. Obergefell numerous times that she had nothing to worry about because her **"job was safe."**

32.     In the Fall of 2019, Ms. Molnar finished NP school and was given a contract that would give her 4 hours a week as a NP and the rest of the time as a RN. Ms. Obergefell was aware that Ms. Molnar was unhappy with her contract because she wanted to work full time as a Nurse Practitioner.

33.     When Ms. Copsey gave Ms. Molnar her contract, she again assured Ms. Obergefell that her **"job was secure."**

7

**The suspicious chronology of events leading up to FRMC's abrupt decision to terminate Ms. Obergefell and the termination meeting**

34.     In January, 2020, Ms. Copsey delayed giving Ms. Obergefell her 2019 annual performance review because she claimed that Executive Vice President and General Counsel Robert Moore was working on a contract for her. However, Mr. Moore never presented Ms. Obergefell with a contract.

35.     In April, 2020, Ms. Molnar had her baby and went on twelve weeks of maternity leave with an approximate return to work date in July.

36.     **Upon information and belief, Ms. Copsey used the COVID-19 pandemic as an excuse to implement her plan to replace Ms. Obergefell with Ms. Molnar when she returned from maternity leave. Ms. Copsey either duped FRMC management into accepting her discriminatory plan or they aided and abetted Ms. Copsey in her discriminatory plan.**

37.     At 1:30 p.m. on Monday, April 27, 2020 Ms. Copsey told Ms. Obergefell that they were scheduled to attend a 2:00 p.m. meeting in the Legal Department with Mr. Moore and Ms. Meisler-McKillips. When Ms. Obergefell asked what was going on, Ms. Copsey dishonestly claimed that "she was not sure" but added that she "did not think it was good." When Ms. Obergefell pressed Ms. Copsey pleading with her to just be upfront with her, Ms. Copsey falsely claimed that "she did not know what was going to happen to either one of us."

38.     Mr. Moore was in charge of the meeting. He began by explaining that because FRMC was losing millions of dollars due to the Covid-19 pandemic, it was necessary to reduce staff. He then explained that management was looking at all departments and making decisions

regarding what positions could be eliminated. He then announced that management had decided to eliminate just Ms. Obergefell's Nurse Practitioner position and then presented her with FRMC's proposed severance agreement.

39.     Mr. Moore claimed that other FRMC staff and other Nurse practitioners would also be terminated, furloughed, or placed on unemployment. In response, Ms. Obergefell asked if instead of eliminating her position, FRMC could reduce her hours, if she could be temporarily laid off, or if she could take a few weeks of vacation until FRMC's numbers improved. Mr. Moore rejected all of Ms. Obergefell's proposed alternatives.

40.     Although Mr. Moore told Ms. Obergefell that she could reapply for her job at a later date if things improved, Ms. Copsey shot down that idea. When Ms. Obergefell asked Ms. Copsey if she would rehire her, she said "I don't know."

41.     At this point in the meeting Mr. Moore reviewed each paragraph of the proposed severance agreement. **In doing so, he mentioned paragraph 4 several times commenting that the paragraph was intended to prevent Ms. Obergefell from suing FRMC for age discrimination. Ms. Obergefell thought that Mr. Moore's emphasis on her waiving her right to sue for age discrimination was significant because she remembered all of the times that Ms. Copsey had told her that she was anxious to hire Jenna Molnar as a Nurse Practitioner so that she would have someone to replace Ms. Obergefell when she retired. Ms. Obergefell also remembered constantly telling Ms. Copsey that she had no plans to retire and was in fact planning to work into her late 60's.**

**Suspicious post-termination events**

42.     Although Mr. Moore told Ms. Obergefell that the reason FRMC had decided to

eliminate her position was because of the financial losses FRMC was suffering as a result of the Covid-19 pandemic and that other employees would also be let go.  At 8:30 a.m. *the next morning,* **Vice President of Operations and Chief Information Officer Deano Ruttino sent an email to all FRMC employees announcing that FRMC was working in the direction to reopen all of its outpatient procedures as soon as May 1 -** *4 days after FRMC terminated Ms. Obergefell.*  He also stated that "[t]his week we are collecting data from all department leaders about what will be needed to bring their service lines back to 100 % if they are not there already."

43.     Upon information and belief, Ms. Copsey did not do an analysis of what is needed in the Wound Care Department but, instead, used the Covid-19 pandemic as the excuse to implement her plan to replace Ms. Obergefell with Ms. Molnar.

44.     As of the date of filing this Complaint, Ms. Obergefell is not aware of FRMC eliminating any other employee's position other than her Nurse Practitioner position.

**FIRST CAUSE OF ACTION**
**Age Discrimination - The ADEA and R.C. Section 4112.02(A).**
**(Against Defendant FRMC)**

45.     Ms. Obergefell realleges the foregoing paragraphs as if fully rewritten herein.

46.     Ms. Obergefell can establish a prima facie case of age discrimination under both the traditional framework and under the heighted burden of proof for reduction in force ("RIF") cases.

a.     Age discrimination claims under both the ADEA and Ohio Rev. Code Section 4112.02 (A) that are based on indirect evidence are analyzed using the *McDonnell Douglas/Burdine* shifting burden of production framework. The employee has the initial burden of establishing a prima facie case of age discrimination by showing that : (1) she was in the statutorily-protected age class; (2) she was discharged;

(3) she was qualified for the position; and (4) her discharge permitted the employer to retain or hire a substantially younger person. Ms. Obergefell can establish a prima facie case of age discrimination under this traditional framework because she is 58 years old, on April 27, 2020 FRMC terminated her position, her annual performance reviews confirm that she was qualified for her Nurse practitioner position, and her discharge permitted Tonya Copsey to implement her plan to replace Ms. Obergefell with the younger, less experienced, and lower paid Jenna Molnar.

b.       In its position statement responding to Ms. Obergefell's EEOC charge [1], FRMC tried to mischaracterize Ms. Obergefell's age discrimination claim as one invovlving a reduction in force ("RIF") thereby requiring her to meet the higher burden of proof established by the Sixth Circuit in *Barnes v. GenCorp Inc.,* 896 F.2d 1457, ?. However, FRMC's attempt fails because it is based on a false narrative. FRMC's decision to terminate Ms. Obergefell was a separate adverse employment action that was not connected to FRMC's subsequent April 27, 2020 RIF of 22 employees. This is confirmed by FRMC's own actions: when FRMC informed Ms. Obergefell of its decision to terminate her, it offered her a severance agreement containing an ADEA waiver for an individual, not a waiver in connection with an employment termination program offered to a group of employees.

c.       Even if FRMC can characterize Ms. Obergefell's age discrimination as one involving a RIF, she can nevertheless meet her higher burden of proof regarding the revised fourth element of a prima facie case announced in *Barnes:* " (4) additional direct, circumstantial, or statistical evidence indicating that the employer singled out the plaintiff for discharge for impermissible reasons." 896 F.2d at ?. FRMC singled out Ms. Obergefell for discharge for impermissible reasons because her discharge permitted Ms. Copsey to implement her plan to replace Ms. Obergefell with the younger and lower paid Ms. Molnar. This evidence is sufficient to establish the Barnes fourth element because, contrary to FRMC's suggestion, the elevated burden borne by plaintiffs in RIF cases "does not equate to quasi-immunity for employers who claim that they were simply seeking to streamline their work force." *Reminder v. Roadway Express, Inc.,* 2005 WL 2860983, at *12 (N.D. Ohio 2005), aff'd., 215 Fed. Appx. 481, 2007 FED App. 0100N (^th Cir. 2007).

---

[1] Copied attached as Exhibit A.

48.     FRMC has offered two conflicting explanations for why it terminated Ms. Obergefell.

a.     When Executive Vice President and General Counsel Robert Moore met with Ms. Obergefell to inform her of FRMC's decision to terminate her,  he explained that FRMC's decided to eliminate her Nurse Practitioner position and terminate her because of the financial losses FRMC had suffered as a result of the Covid-19 pandemic.

b.     Yet, in its EEOC position statement, FRMC offered a conflicting explanation: "Ms. Obergefell was selected for layoff for lawful and legitimate reasons, wholly unrelated to her age." Exhibit A at 2.

49.     Ms. Obergefell can prove that both FRMC's original explanation and its conflicting explanation for terminating her are pretexts for age discrimination.

a.     FRMC's original explanation is a pretext for age discrimination for several reasons including, but limited to, the following. As discussed above, Mr. Moore presented Ms. Obergefell with a proposed Severance Agreement containing the required Older Workers Benefit Protection Act language for an individual severance, not a group severance. His frequent references to the ADEA waiver during the termination meeting was a subliminal message that the real reason FRMC terminated Ms. Obergefell was her age. In direct contradiction with Ms. Copsey comments in Ms. Obergefell's 2019 annual evaluation that "**Laurie … continues to be a valued team member of the wound care department as well as the Firelands organization" and that "Laurie is an expert in her role within our wound care program,**" Ms. Copsey decided to eliminate Ms. Obergefell's position but retain the younger and less experienced Jenna Molnar. Ms. Molnar was a new Nurse Practitioner in the Wound Care Department and therefore, unlike Ms. Obergefell, had not yet established either that she was a "valued team member" of the department or an "expert in her role." Most significantly, Ms. Obergefell's termination turned out exactly as Ms. Copsey had been telling Ms. Obergefell since 2016: when Ms. Molnar completed her NP schooling, she was going to hire her as Ms. Obergefell's replacement when she retired. When Ms. Obergefell did not play along with Ms. Copsey plan by telling her that she had no plans to retire, Ms. Copsey used FRMC's RIF to cover up her discriminatory decision to terminate Ms. Obergefell based on her age which was consistent with her past practice of getting rid of other older employees in the Wound Care Center because of their age.

b.      FRMC's alleged "lawful and legitimate business reasons" for selecting Ms. Obergefell for layoff cited in its EEOC position statement are also a pretext for age discrimination. Although the Wound Care Center experienced a drop in patients because of COVID-19, Ms. Copsey could have reassigned Ms. Obergefell to work as a part-time CNP and the rest of the time as an RN, just like she had assigned Jenna Molnar. Contrary to FRNC's assertion on page 3 of its position statement, Ms. Obergefell was not the only CNP in the Wound Care Center who did not perform a dual role because Ms. Obergefell could have worked as both a CWP and as an RN. Even though Ms. Copsey was the only Certified Wound Ostomy Continence Nurse, Ms. Obergefell was the only CWP certified to treat children. The four (4) CNP hours per week limitation in Ms. Molnar's Employment Agreement did not prevent Ms. Copsey from offering Ms. Obergefell the same employment arrangement which she had offered to Ms. Molnar. In fact, during her termination meeting Ms. Obergefell had offered to work any alternative arrangement that was necessary to meet the Wound Care Center's needs but Executive Vice President and General Counsel Robert Moore rejected her offer. Finally, FRMC and Ms. Copsey cannot not rely on Ms. Obergefell's higher billable rate than Ms. Molnar's billable rate because courts have found that using pay as a factor in selecting employees for layoff has a disparate impact on older workers. (Need to cite the *Borden* case and any other recent cases).

50.      As a proximate result of FRMC terminating Ms. Obergefell's employment because of her age, Ms. Obergefell has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

## SECOND CAUSE OF ACTION
### Aiding and abetting discrimination - R.C. § 4112.02 (J)
### (Against all of the individual Defendants))

51.      Ms. Obergefell realleges the preceding paragraphs as if fully rewritten herein.

52.      Ohio Rev. Code Section 4112.02 provides, in pertinent part, that:

It shall be an unlawful discriminatory practice:

\*            \*            \*

(J)      For any person to aid, abet, incite, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice ….

**13**

53.     In *Genero v. Central Transport, Inc.* (1999), 84 Ohio St.3d 293,  703 N.E. 2d 782 (Ohio 1999), the Ohio Supreme Court ruled that the plain language of Chapter 4112, particularly the definition of "employer,"imposes individual liability for discriminatory conduct. Ohio Rev. Code Section 4112.01 (A)(2) defines "employer" to include "any person acting directly or indirectly in the interest of the employer."

54.     All of the individual Defendants aided and abetted Ms. Copsey in her discriminatory plan to terminate Ms. Obergefell and replace her with the younger, less qualified, and lower paid Ms. Molnar.

55.     As a proximate result of the individual Defendants' aiding and abetting Ms. Copsey's discriminatory plan to terminate Ms. Obergefell because of her age, Ms. Obergefell has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

**THIRD CAUSE OF ACTION**
**Wrongful Discharge in violation of public policy**
**(Against FRMC and the Individual Defendants)**

56.     Ms. Obergefell realleges the preceding paragraphs as if fully rewritten herein.

57.     As evidenced by the federal Age Discrimination in Employment Act and the Ohio Civil Rights Act this nation and the State of Ohio has a clear public policy prohibiting age discrimination in the workplace.

58.     Ms. Obergefell is the victim of age discrimination because Ms. Copsey implemented her plan to get rid of Ms. Obergefell and replace her the younger, less qualified, and lower paid Ms. Molnar.

59.     All of the members of FRMC management who participated in the decision to eliminate Ms. Obergefell's Nurse Practitioner position and terminate her are guilty of the "bystander effect" because they stood by and did nothing to stop Ms. Copsey from discriminating against Ms. Obergefell because of her age.

60.     Defendants' actions were willful, malicious, and/or in reckless disregard of Ms. Obergefell's legal rights.

61.     As a result of Defendants' wrongful discharge of Ms. Obergefell in violation of public policy,  Ms. Obergefell has been and continues to be damaged and is entitled to compensation.

### FOURTH CAUSE OF ACTION
### Wrongful Discharge - Breach of an implied contract
### (Against Defendant FRMC)

62.     Ms. Obergefell realleges the preceding paragraphs as if fully rewritten herein.

63.     Ohio courts recognize implied contract as an exception to the employment-at-will doctrine. Whether explicit or implicit contractual terms have altered an at-will-employment agreement depends upon the history of the relations between the employer and employee, as well as the facts and circumstances surrounding the employment relationship. *Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St. 3d 571, 574, 1995-Ohio-114, 653 N.E. 2d 381. The relevant facts and circumstances include "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question * * *." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), paragraph two of the syllabus. *See also Kelly v. Georgia-Pacific Corp.,* 46 Ohio St.3d 134, 545 N.E.2d 1244 (1989), paragraph
two of the syllabus.

64.     FRMC has adopted several policies which constitute Ms. Obergefell's implied employment contract. These policies include, but are not limited to, the Equal Employment Opportunities Policy which states that **FRMC "maintains a philosophy of fair employment rights with equal opportunity for all … employees regarding ...retaining …[and] terminating… and all other terms and conditions of employment."** This Policy also states that **"[n]o person shall be subject to discrimination due to ...age …"** The Staffing Plans Policy which states that **"[e]ach department, with consultation and approval as**

needed from Human Resources and Administration, develops a staffing plan to meet the care, treatment, and service needs of its patients." The Staffing/Work Assignments and LOW Time (Lack of Work) Policy which states in the stewardship in providing excellent patient care and services, "work assignments may be adjusted to meet increased demand for hours or hours reduced in an effort to minimize expenses to the organization when it has been determined there is a lack of work available." The Reductions In Force and Severance Pay Policy which states FRMC "strives to avoid reductions in workforce whenever possible," "[r]eductions in force will follow an orderly procedure" outlined in the policy and that in making a decision to eliminate a position or reduce the workforce, management will consider specific guidelines. These guidelines include "promote fair and respectful treatment of employees by considering, in making their decisions: the employee's knowledge, skills and abilities, performance evaluations for the last year or two, records of performance improvement given to the employee within the last year, and length of service when other criteria are relatively equal." (Copies of these policies are attached to this Complaint as Attachments 1, 2, 3, and 4).

65.     Ms. Obergefell can establish all the elements for a breach of an implied contract of employment claim because: (1) she had an implied contract of employment based on FRMC's policies discussed in the preceding paragraph; (2) she performed her obligations under this implied contract; (3) FRMC breached the implied contract by not following its own policies and by allowing Ms. Copsey to discriminate against her because of her age;  and (4) she has and continues to suffer damages from FRMC's beach of the implied contract.

66.     As a result of FRMC's breach of her implied contract of employment, Ms. Obergefell has suffered and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

### FIFTH CAUSE OF ACTION
### Wrongful Discharge - promissory estoppel
### (Against Defendant FRMC)

67.     Ms. Obergefell realleges the preceding paragraphs as if fully rewritten herein.

68.     The doctrine of promissory estoppel is intended to stop a promisor from arguing that the underlying promise that was made should not be legally enforced. Promissory estoppel arises when a defendant makes "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance.'"  *Hortman v. Miamisburg,* 110 Ohio St. 3d 194, 2006 Ohio 4251, Paragraph 23, 852 N.E. 2d 716, quoting Restatement of the Law 2d, Contracts, Section 90, at 242 (1981).

69.     To prove a claim for promissory estoppel, a plaintiff must prove: (1) a clear, unambiguous promise; (2) that the person to whom the promise was made relied on the promise; (3) that reliance on the promise was reasonable and foreseeable; and (4) that the person claiming reliance was injured as a result of reliance on the promise.

70.     Ms. Obergefell can establish these elements regarding FRMC's breach of promises it made to her in its personnel policies. These promises include: the promise that she would not be discriminated against because of her age (the Equal Employment Opportunities Policy); the promise that each department will develop a staffing plan (the Staffing Plans Policy); the promise that work assignments may be adjusted by reducing hours to minimize expenses to the organization when it has been determined that there is a lack of work available (the Staffing/Work Assignment and LOW Time (Lack of Work) Policy); and the promises that **FRMC "strives to avoid reductions in force whenever possible,"** that "[r]eductions in force will follow an orderly procedure," and that in making a decision to eliminate a position, **management will consider specific guidelines to "promote fair and respectful treatment of employees."** (the Reductions In Force and Severance Pay Policy).  Ms. Obergefell relied on these promises. Ms. Obergefell's reliance on the FRMC's promises was reasonable and foreseeable. Finally, Ms. Obergefell has been and continues to be injured as a result of FRMC breaching the promises it made to her.

71.     As a proximate cause of FRMC breaching the promises it made to Ms. Obergefell, she

has suffered and continues to suffer damages for which she is entitled to all of the appropriate remedies

available to her.

**SIXTH CAUSE OF ACTION**
**Fraud and Misrepresentation**
**(Against all of the Defendants)**

72.     Ms. Obergefell realleges the foregoing paragraphs as if fully rewritten herein.

73.     As discussed above FRMC made a series of promises to Ms. Obergefell: These promises

include: the promise that she would not be discriminated against because of her age (the Equal

Employment Opportunities Policy); the promise that each department will develop a staffing plan (the

Staffing Plans Policy); the promise that work assignments may be adjusted by reducing hours to minimize

expenses to the organization when it has been determined that there is a lack of work available (the

Staffing/Work Assignment and LOW Time (Lack of Work) Policy); **and the promises that FRMC**

**"strives to avoid reductions in force whenever possible," that "[r]eductions in force will follow an**

**orderly procedure," and that in making a decision to eliminate a position, management will consider**

**specific guidelines to "promote fair and respectful treatment of employees." (the Reductions In Force**

**and Severance Pay Policy).**

74.     In addition, Ms. Copsey repeatedly made promises of job security to Ms. Obergefell that her

"job was secure."

75.     FRMC's abrupt decision to eliminate Ms. Obergefell's NP position violated the promises

that FRMC had made to her and violated Ms. Copsey's assurances that Ms. Obergefell's "job is secure."

76.     Consequently, both FRMC and Ms. Copsey have committed the tort of intentional

18

misrepresentation under Ohio law.

77.     FRMC and Ms. Copsey have also committed the tort of fraud under Ohio law.

78.     As a result of FRMC and Ms. Copsey misrepresentation and fraud, Ms. Obergefell has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against all of the Defendants)

79.     Ms. Obergefell realleges the foregoing paragraphs as if fully rewritten herein.

80.     "To establish a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant, through extreme and outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress." *Mowery v. Columbus,* 10th Dist. No. 05AP-266, 2006-Ohio-1153, Paragraph 48.

81.     As discussed in the above Statement of Facts, all of the Defendants engaged in extreme and outrageous conduct against Ms. Obergefell.

82.     The Defendants' extreme and outrageous conduct caused Ms. Obergefell to suffer severe emotional distress.

83.     Under the doctrine of respondeat superior, FRMC is vicariously liable for the acts of its employees because these acts were within the scope of their employment.

84.     As a result of the Defendants' intentional infliction of emotional distress, Ms. Obergefell has and continues to suffer damages for which she is entitled to all of the appropriate remedies available to her.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Obergefell demands judgment against Defendants FRMC, Tonia Copsey, Jenna Molnar, Patty Martin, Denise Parrish, Jody Meisler-McKillips, Robert Moore, and Jeremy Normington-Slay as follows:

(a)     That FRMC be ordered to immediately reinstate her to her Nurse Practitioner position in the Wound Care Department or to an equivalent position.

(b)     That FRMC pay her any and all back pay and lost benefits she has suffered.

(c)     That she be awarded compensatory damages from Defendants in an amount to be determined at trial, but in no event less than $350,000.

(d)     That she be awarded punitive damages in an amount sufficient to deter the Defendants from engaging in similar employment discrimination, wrongful discharge, and workplace torts in the future in an amount to be determined at trial, but in no event less than $700,000.

(e)     That FRMC be ordered to expunge her official personnel file and any and all other files kept on her by FRMC and any of its employees and agents.

(f)     That all of the individual Defendants be ordered to attend remedial training regarding an employer's obligations not to discriminate against an employee based on age and the preventive measures they need to take to avoid repeating this unlawful misconduct in the future.

(g)     That she be awarded both pre-judgment interest and post-judgment interest.

(h)     That she be awarded reasonable attorney's fees and costs from the Defendants.

(i)     Finally, that she be awarded all other legal and equitable relief to which he may be entitled from the Defendants.

Dated:  April 11, 2020                                    /s/ **Peter K. Newman**
                                                         Peter K. Newman (0010468)
                                                         **THE NEWMAN LAW GROUP LLC**

594 Garden Road
Dayton, OH 45419
Ph: 937.475.6282
Email: newmanlawgroup@gmail.com

*Attorney for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury

/s/ **Peter K. Newman**
Peter K. Newman (0010468)

21

**22**

**24**

**25**