UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Laura Obergefell,                                    Case No. 3:20-cv-2579

                    Plaintiff,

        v.                                           MEMORANDUM OPINION
                                                     AND ORDER

Firelands Regional Medical Center, et al.,

                    Defendants.


## I.    INTRODUCTION

Plaintiff Laura Obergefell brings claims under the Age Discrimination in Employment Act

("ADEA") and Ohio law based on events surrounding her April 2020 termination against her

former employer, Defendant Firelands Regional Medical Center ("FRMC"), and FRMC's employees

at the time, Defendants Tonia Copsey, Jenna Molnar, Patty Martin, Denise Parrish, Jody Meisler-

McKillips, Robert M. Moore, and Jeremy Normington-Slay.

Before me now are Obergefell's motion for partial summary judgment, (Doc. No. 100),[1] and

Defendants' collective motion for summary judgment of all claims.  (Doc. No. 115).  Each side filed

an opposition brief to their opponent's cross-motion.  (Doc. Nos. 120 and 121).  For the reasons

stated below, I deny Obergefell's motion and grant Defendants' motion.

---

[1] Obergefell previously filed another motion for summary judgment.  (Doc. No. 93).  She
subsequently filed a corrected version of that motion, (Doc. No. 100), and a motion to withdrawal
her first motion for summary judgment.  (Doc. No. 101).  I grant the motion to withdrawal, (Doc.
No. 101), and withdraw Obergefell's first motion for summary judgment.  (Doc. No. 93).
Accordingly, I will consider her corrected motion only.  (Doc. No. 100).

## II. BACKGROUND

"FRMC is a full-service regional medical center based in Sandusky, Ohio that serves residents in five Ohio counties. FRMC has over 200 physicians on its medical staff and over 2,100 employees providing care at over 20 locations." (Doc. No. 115-2 at 1). One line of service offered by FRMC is "the care of patients with chronic or non-healing wounds through its Wound Care and Hyperbaric Center ('WCC'). The WCC providers serve patients at FRMC's central location in Sandusky, Ohio, and provide extension wound care services at offsite clinics." (*Id.* at 2).

At the times relevant to this litigation, March and April of 2020, the WCC was staffed by the following individuals:

> a. Tonia Copsey - Full-time Nurse Director of WCC, Nurse Practitioner, and Enterostomal Therapist;
> b. Laura Obergefell: Full-time Nurse Practitioner;
> c. Monica Vance: Full-time RN Care Coordinator;
> d. Megan Waffen-Full-time RN Care Coordinator;
> e. Jenna Molnar - Part-time RN Care Coordinator and PRN Nurse Practitioner;
> f. Amy Williams - PRN RN Care Coordinator;
> g. Jennifer Forbes -Part-time RN Care Coordinator;
> h. Sharon Carbary - PRN RN Care Coordinator;
> 1. Jamie Mock - PRN RN Care Coordinator;
> J. Holly Clayman - Full-time Office Coordinator; and
> k. Kelly Kilgore: Full-time Clerk/Receptionist.

(Doc. No. 115-2 at 2). "PRN is a term of art commonly used in relation to employment in healthcare settings [and] refers to employees who do not work a set schedule and instead only work when they are needed, often providing coverage when other employees are unavailable or absent." (*Id.*).

This case centers on one of the WCC's providers - Laura Obergefell, who held her full-time Nurse Practitioner ("NP") position in the WCC from January 2008 until April 27, 2020, when her position was eliminated, and she was terminated. (Doc. No. 51 at 24, 61-62, 105). While Obergefell was the only WCC staff member terminated at that time, FRMC terminated nineteen employees system-wide from April 23, 2020, to June 26, 2020, as part of FRMC's response to financial

problems resulting from the COVID-19 pandemic. (Doc. No. 115-2 at 4; *see also* Doc. No. 114). Obergefell now alleges she was selected for termination because of her age – 58 at the time of her termination. (Doc. No. 1).

### A. COVID-19 PANDEMIC

On March 9, 2020, Ohio Governor Mike DeWine issued an Executive Order declaring a state of emergency in Ohio as COVID-19 swept across the United States.[2] Soon after, in the face of a shortage of personal protective equipment ("PPE") worldwide, the Ohio Department of Health issued an Order on March 17, 2020, requiring that "[e]ffective 5:00 p.m. Wednesday March 18, 2020, all non-essential or elective surgeries and procedures that utilized PPE should not be conducted."[3]

Even before non-essential procedures had been prohibited, FRMC had activated "Incident Command" on March 13, 2020, in response to the news that schools would be shut down. (Doc. No. 59 at 10). "Incident Command" is activated "any time that there's basically a disaster or anything that's unusual or taxing to the health care system [to] get[] the right people at the table to kind of talk through what's happening." (*Id.*). In this case, FRMC had to address both patient care and its finances in the wake of the burgeoning pandemic. (*Id.* at 11).

As FRMC's President and CEO Jeremy Normington-Slay, (Doc. No. 111-10), testified, "those first couple of weeks . . . 99 percent of the effort was around building capabilities to care for COVID. So in those first two or three weeks we completely built an isolation unit for COVID." (Doc. No. 55 at 24). He recalled, the "[h]ospital reconstruction was huge. And actually we finished that project the day we got our first COVID admission, which I think was maybe one of the last days in March." (*Id.*).

---

[2] Executive Order 2020-01D, available at https://governor.ohio.gov/media/executive-orders/executive-order-2020-01-d.

[3] Available at https://governor.ohio.gov/media/news-and-media/elective+surgeries-postponed-in-ohio-hospitals.

3

After FRMC had spent "the first couple of weeks [getting] clinically prepared," and the pandemic "started to drag out, … the sustainability question [came], 'You know, where are we spending money?' 'Where do we need to look at some savings, expenses?'" (*Id.* at 25).

By this time, things had turned dire.  As FRMC's Executive Vice President of Legal Affairs and General Counsel, Rob Moore, (Doc. No. 111-10), recalled,

> [FRMC was] having to deal with shutting down a number of different services, including any kind of elective surgeries, which is kind of where our bread and butter is.
>
> …
>
> So digestive health, we shut that down. So there was a variety of different things.
>
> I actually was on the committee that, with four other physicians, basically surgeons and anesthesiologists and our chief medical officer, to decide who would have surgery and who wouldn't have surgery.  So it was a pretty rough time.  As it pertains specifically to this, we were just looking, depending on the different departments on the different offices, what we could do, trying to be sensitive of displacing or terminating people, but at the same time trying to maintain what -- you know, to keep the operations running.  We had no idea, like, "Is this going to get even worse?"

(Doc. No. 53 at 24-25).  Specifically, on the financial side, FRMC lost its primary source of revenue: elective surgeries.  (*Id.* at 25).  FRMC went from performing 40 to 45 surgeries "on a good day" to six or seven.  (*Id.*).

Normington-Slay "tasked senior management with coming up with ideas on how to deal with the financial crisis" FRMC was facing.  (Doc. No. 59 at 11).  With FRMC's "revenue streams were drying out fast," they were "to look at everything under the sun from … reassignments to reduction in salaries."  (Doc. No. 53 at 57).  The options FRMC discussed included a reduction in force ("RIF").  While Normington-Slay had advised employees by email at the beginning of April that FRMC was "working diligently to not implement any permanent layoffs during this time," (Doc. No. 110-21 at 2), FRMC had lost almost $5 million by the end of April and decided to implement permanent layoffs.  (Doc. No. 53 at 57-58).

4

Moore and Jody Meisler-McKillips, FRMC's Senior Director of Human Resources, (Doc. No. 111-10), were charged with evaluating and implementing this RIF.  (Doc. No. 55 at 33-34).  Meisler-McKillips started this process by contacting department heads to gather information.[4]  (Doc. No. 60 at 11-12).  As part of these efforts, Meisler-McKillips contacted WCC Director, Tonia Copsey.  (*Id.* at 12).

The COVID-19 pandemic had dealt the WCC a particularly hard blow, reducing its business by up to 40 percent.  (Doc. No. 53 at 66-67).  As Obergefell explained:

> the hospital had said, you know, to try to cut back, not to do debridements, try not to use as much equipment.  We need to save it.  We can -- you know, that type of thing.  Trying to save gloves and masks.
>
> I know the biller had come and said, "You need to try to look at your patients and figure out who really needs to be seen.  Who is in a nursing home.  We don't want those people coming here.  We want to try to limit the number of people that we are bringing in here."
>
> And so that's what I did.  I picked out the people that I thought maybe were immunocompromised that shouldn't be coming in, the nursing home patients, that type of thing.  And they cut those down. So my patients went from, you know, ten a day to two a day.

(Doc. No. 51 at 90-91).  On days where Obergefell had "very few" to no patients, she still worked her shift as scheduled and helped out in the WCC where she could.  (*Id.* at 92-93).

Unfortunately, according to Moore, the reduced volume in the WCC "really became an economic issue.  [FRMC] had two full-time providers that were not being able to meet the -- able to get the services.  Get the volume."  (Doc. No. 53 at 66).  Specifically, Meisler-McKillips noted that the "volume" that was lacking were "patients seeking billable services of Nurse Practitioners."  (Doc. No. 115-2 at 3).  While no doubt important, the tasks performed by Obergefell in the WCC

---

[4] In Meisler-McKillips's deposition, "information gathering" emails are discussed.  (Doc. No. 60 at 11-12).  But the parties do not identify any such email as part of the record evidence introduced.

when she had "very few" or no patients were "non-billable tasks outside the scope of her Nurse Practitioner role." (Doc. No. 51 at 92-93; Doc. No. 115-2 at 3).

It was in the midst of this, in April 2020, that Meisler-McKillips contacted Copsey to discuss WCC staffing issues in the course of gathering information for the RIF. (Doc. No. 60 at 12; Doc. No. 115-2 at 3). At that time, PRN NP Molnar was on a leave of absence through July 2020, and the two full-time, salaried NPs – Obergefell and Copsey – were performing all of the WCC's NP services. (Doc. No. 115-2 at 3). But even dividing these services between only two and not three NPs, "the level of available billable work for Nurse Practitioners did not justify continuing to pay the salaries of two full-time Nurse Practitioners." (Doc. No. 115-2 at 3).

Faced with this reality, Copsey proposed reducing Obergefell's hours to 18-hours per week rather than eliminating her position. (Doc. No. 52 at 62-69; Doc. No. 115-2 at 3). But ultimately, "the business decision was made that the second full-time Nurse Practitioner position in the WCC could be eliminated entirely without adversely impacting WCC operations." (Doc. No. 115-2 at 3). "Copsey had the capacity to absorb what little billable Nurse Practitioner work Ms. Obergefell was performing," (*id.*), and "the work wasn't there to justify additional NP hours." (Doc. No. 60 at 92).

While FRMC looked into whether there were open NP positions to which Obergefell could be transferred, none existed. (Doc. No. 115-2 at 3). Therefore, with the elimination of her position, Obergefell's employment would be terminated.

On April 27, 2020, Obergefell was notified that her position was being eliminated and she was being terminated because of FRMC's financial losses suffered because of the COVID-19 pandemic. (Doc. No. 51 at 105, 108).

As stated above, Obergefell was one of twenty employees terminated as part of FRMC's system-wide RIF between April 23, 2020, and June 26, 2020. (Doc. No. 115-2 at 4; *see also* Doc. No. 114). Those impacted worked primarily in departments "that were not having volume come

through their area." (Doc. No. 57 at 76; *see also* Doc. No. 114). Aside from the RIF, FRMC also implemented other cost-cutting measures including: "hiring freezes for open positions, reductions in hours, limitations on overtime, employee furloughs, freezing the tuition reimbursement program, reducing the 401k contribution, physician pay cuts[,] and salary reductions for senior leadership." (Doc. No. 115-2 at 5).

### B.   OBERGEFELL'S AGE DISCRIMINATION CASE

Following her termination, Obergefell filed an EEOC Charge of Discrimination, alleging she was terminated because of her age. (Doc. No. 111-14). Specifically, she asserts Copsey had a history of ageism and used the RIF as a vehicle to terminate Obergefell because of her age and expedite her preexisting plan to replace Obergefell with Molnar upon Obergefell's retirement.

Obergefell testified that Copsey first disclosed this plan in 2016 when Molnar, who had worked in the WCC as an RN, began NP school, recalling:

> Tonia had just come out of her office. I was in the little break room. There were several people around. I don't know who. And she said something like, "When Jen finishes NP school, I'm going to hire her."
>
> And I said, "What are we going to do with three NPs?"
>
> And she goes, "Well, I need somebody to replace you when you retire."
>
> And I said, "I don't know how old you think I am, but I still have a few more years."
>
> [Copsey replied,] "Well, I need to get somebody in this job so when you retire, that they will know what they are doing, and I leave the Wound Care Center in basically . . . good shape."

(Doc. No. 51 at 170).

When Molnar graduated from NP school, Copsey did seek to hire her as an NP in the WCC in or around September 2019. As Moore recalled, "Tonia, advocating for her department, was saying, we've got this other young star that can come in and help out." (Doc. No. 53 at 51). In

support of her request that FRMC create an additional NP position in the WCC for Molnar, Copsey

submitted a form to Meisler-McKillips wherein she provided the following response:

> 5. If we are faced with layoffs in the future, would this new FTE/position be the most likely to be subject to the layoff? Yes
>
> The 2 FT APRN providers would need to stay d/t the FT status and the one APRN being the Nurse Director.  Looking to the future however, the FT NP will be retiring within the next 8 years or so and I will need to fill that spot with another NP, preferably moving this PRN NP into a PT or FT provider status (retaining a valued hospital employee).

(Doc. No. 110-6 at 5).

FRMC approved Copsey's request to the extent that it created a part-time PRN NP position

to "back up" Obergefell and Copsey and hired Molnar to fill that position in the fall of 2019.  (Doc.

No. 53 at 63-64; *see also* Doc. No. 110-12).  With this, Molnar assumed the dual role of PRN NP and

part-time RN and continued performing "primarily" RN work.  (Doc. No. 53 at 64; *see also* Doc. No.

115-2 at 2).

Months later, when faced with the RIF, Molnar's position was not eliminated.  But Molnar

did not replace Obergefell either.  Instead, Molnar remained a PRN NP until December 2020 when

she resigned because her "hours even as an RN were not really quite guaranteed because our volume

was fluctuating so much."  (Doc. No. 56 at 36; Doc. No. 115-2 at 4).

### III.    STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter*

*Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the

nonmovant's favor.  *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).  A factual

dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the

nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is

material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

With respect to burden, the moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party cannot rest on its pleadings or merely reassert its previous allegations but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).

"This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021). That is, "where, as here, the parties filed cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (internal quotation marks and further citation omitted).

Ultimately, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. I must determine "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## IV.    ANALYSIS

Through this action, Obergefell brings one ADEA claim against FRMC. (Doc. No. 1 at 10-13). She also asserts claims under Ohio law for: (1) age discrimination; (2) aiding and abetting age discrimination; (3) wrongful discharge in violation of public policy; (4) wrongful discharge in violation of an implied contract; (5) wrongful discharge under the doctrine of promissory estoppel; (6) fraud and misrepresentation; and (7) intentional infliction of emotional distress. (*Id.* at 10-19).

After filing her motion for summary judgment, Obergefell filed a motion to voluntarily dismiss her state law claim of wrongful discharge in violation of public policy. (Doc. No. 104). With no opposition by Defendants, I grant the motion and dismiss that claim with prejudice under Federal Rule of Civil Procedure 21. *See, e.g., Bernard v. City of Cleveland*, No. 1:21-CV-1103, 2022 WL 4367655, at *1 (N.D. Ohio Sept. 21, 2022) (finding Rule 21 the proper procedural vehicle to voluntarily dismiss less than an entire action).

Remaining are Obergefell's claim under the ADEA and six Ohio law causes of action. Defendants seek summary judgment of all remaining claims. (Doc. No. 115). Obergefell seeks summary judgment of all but her claims for wrongful discharge in violation of an implied contract and under the doctrine of promissory estoppel. (Doc. No. 100).

### A.    EVIDENTIARY ISSUES

Federal Rule 56(c) sets forth the following procedures governing evidentiary matters at the summary judgment stage:

> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2) *Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3) *Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

**(4) *Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Here, both Obergefell and Defendants submit evidentiary challenges to their opponents' proffered evidence. I will address each before turning to my analysis of Obergefell's claims.

       1.       **Obergefell's Challenge**

Obergefell asks that I strike the declaration of Meisler-McKillips submitted as an Exhibit to Defendants' motion for summary judgment, (Doc. No. 115-2), arguing the declaration contradicts Meisler-McKillips's deposition testimony in violation of the sham affidavit doctrine. (Doc. No. 120 at 12-13 (citing *France v. Lucas*, 836 F.3d 612, 222 (6th Cir. 2016))).

The thrust of Obergefell's argument is based on her belief that "Defendants improperly use Jody Meisler-McKillips' Declaration to present a new articulated reason for FRMC's decision to terminate Obergefell: FRMC's decision was the result of an alleged long term discussion about the unprofitability of the Wound Care and Hyperbaric Center (['']WCC')." (Doc. No. 120 at 12). But this belief is not based in fact.

11

In its motion for summary judgment, FRMC articulated the following as its reason for terminating Obergefell:

> FRMC eliminated the positions of twenty employees in April, May, and June 2020 as a result of the immediate and serious financial impact of the COVID-19 pandemic. The COVID-19 pandemic had a particularly devastating impact on the WCC, resulting in low patient volume, a lack of work for Obergefell, and a pressing need for cost-saving.

(Doc. No. 115-1 at 17-18).  This reason is consistent with FRMC's position statement in response to Obergefell's EEOC charge.  There, FRMC stated, "On April 27, 2020, FRMC permanently laid off twenty-two (22) employees due to financial problems exacerbated by the COVID-19 pandemic.  Ms. Obergefell was included in this reduction in force ('RIF')."  (Doc. No. 110-5 at 7).

FRMC further explained, "In March and April of 2020, the Wound Care Center experienced a sharp drop in patients and Ms. Copsey assigned Ms. Obergefell various non-billable tasks to keep her busy because there were too few patients requiring the billable services of a CNP. … Unfortunately, while Ms. Obergefell was an excellent CNP, there was insufficient CNP billable work to be performed to justify her salary, which was significantly higher than others in the Wound Care Center."  (*Id.* at 7-8).

Contrary to Obergefell's argument, FRMC's articulated reason is not "new" and has nothing to do with "long-term discussions" about the unprofitability of the WCC.  Instead, FRMC has maintained that it terminated Obergefell as a result of financial problems caused by COVID-19, including the WCC's "sharp drop in patients" resulting in "insufficient CNP billable work to be performed to justify [Obergefell's] salary."  (Doc. No. 110-5 at 7-8).  Therefore, I conclude her consistency challenges are not based in fact and reject them, accordingly.[5]  Her request to strike Meisler-McKillips's declaration is denied.

---

[5] For the same reasons, I reject her conflicting-explanations pretext argument.  (Doc. No. 120 at 13-14).

2.      **Defendants' Challenges**

Defendants argue the "statements of Shelly Warnement and Jenn Forbes . . . are both unsworn and unverified, and may not be used to support or defeat a motion for summary judgment."[6] (Doc. No. 121 at 17; *see* Doc. Nos. 111-19 and 111-20).  The statements in question appear to be screenshots from a smart phone of a text message and an email purportedly sent by these individuals to Obergefell's counsel, Peter Newman.  In substance, the statements are effectively declarations as they purport to set out facts personally known by these individuals from their time working in the WCC.  *See* Fed. R. Civ. P. 56(c)(4).  But as correctly stated by Defendants, neither statement is sworn.  Further, neither statement satisfies the requirements for unsworn statements that may be considered pursuant to 28 U.S.C. § 1746.  *See* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment.  Therefore, I sustain Defendants' objection and exclude from consideration these two exhibits Obergefell offered.  (Doc. Nos. 111-19 and 111-20).

---

[6] Within the section of their brief challenging "inadmissible evidence," Defendants also object to "[t]he inadmissible hearsay proffered by Obergefell" and assert they "are unable to discern what material Obergefell cites to support her theory that older LPNs were forced out the WCC in 2011, or whether it is admissible Rule 56 evidence that can be considered by this Court to support her motion." (Doc. No. 121 at 17-18).  Neither of these are meaningful admissibility objections.  First, Defendants fail to identify any specific evidence they consider to be "inadmissible hearsay."  And second, Defendants' challenge to the LPN-related evidence challenges whether any evidence exists to support this theory, not whether the evidence is admissible.

Aside from this, I am mindful that Defendants asserted this challenge in their opposition brief to Obergefell's motion for summary judgment, and that I ordered no reply brief be filed in support of the parties' dueling motions for summary judgment. (*See* Doc. No. 102).  Even so, Obergefell did file a motion for oral argument after the briefing had concluded. (Doc. No. 124).  This motion restated the standard of review applied to cross motions for summary judgment but made no suggestion that further argument was required to address Defendants' evidentiary challenge raised first in the opposition brief.  Because Obergefell did not raise the issue in this responsive filing or any others, I conclude the objection to be ripe for my review and that Obergefell has made no attempt to satisfy her "burden . . . to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment; *see also E.E.O.C. v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1050 n. 12 (E.D. Tenn. 2015) (concluding the proponent had not met the burden of showing admissibility when the challenge was raised in the reply brief and the proponent "did not request leave to file a sur-reply in order to rebut such arguments.").

### B.   AGE DISCRIMINATION

In her Complaint, Obergefell asserts as Count One a claim of age discrimination against FRMC under both the ADEA and Ohio Revised Code § 4112.02(A).  (Doc. No. 1 at 10-13).  "Under Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998).  Accordingly, I will consider the state and federal claims together and decline to consider the Ohio law claim separately.  *See, e.g.*, *Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 264 (6th Cir. 2019).

The ADEA prohibits employers from "discharg[ing] any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  "To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'"  *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs, Inc.*, 557 U.S. 167, 177-78 (2009)).

Relying on *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), Obergefell contends "but-for causation does not require proof of sole causation."  (Doc. No. 100 at 16).  But the Sixth Circuit has expressly held "the rule in *Bostock* extends no further than Title VII and does not stretch to the ADEA."  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).  Therefore, the requirement that the plaintiff show "that age was *the* determinative reason they were terminated" stands.  *Id.* (emphasis in original).  "[T]hat is, [the employee] must show 'that age was the "reason" that the employer decided to act.'"  *Id.* (quoting *Scheick*, 766 F.3d at 529).

The employee can make such a showing through either direct or circumstantial evidence.  *See Scheick*, 766 F.3d at 529-30.  Obergefell alleges she can succeed under either evidentiary route.

14

### 1. Direct Evidence

Direct evidence is that which "requires the conclusion that age was the 'but for' cause of the employment decision." *Id.* at 530. It must show "a predisposition to discriminate and that the employer acted on that predisposition . . . 'without requiring any inferences.'" *Id.* (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). In other words, "[t]he evidence, on its own, must lead a reasonable juror to conclude that a decisionmaker was biased, and that adverse animus motivated the adverse action." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 580-81 (6th Cir. 2022). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, satisfy this criteria." *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (quotation and internal alterations omitted).

Here, Obergefell does not allege Copsey or anyone else made any remark about her age. Instead, she cites those 2016 and 2019 comments related to Copsey's desire to hire "young star" Molnar with the intent that Molnar replace Obergefell upon Obergefell's retirement.[7] (Doc. No. 100 at 15 (citing Doc. No. 51 at 170; Doc. No. 53 at 51; Doc. No. 110-6 at 5)). In her opposition brief, Obergefell also suggests Copsey's alleged history of ageism against other older WCC employees may serve as direct evidence. (Doc. No. 120 at 16-18). None of the evidence Obergefell offers meets the Sixth Circuit's criteria for "direct evidence."

First, it is well-settled that "retirement does not necessarily refer to someone's age." *Pelcha*, 988 F.3d at 325; *see also Scott*, 182 F. App'x at 526 (explaining that "'retire' and 'age' are not synonyms."). Instead, it "would require an inference to conclude that retirement was a proxy for age

---

[7] Obergefell also argues Copsey's decision not to follow the layoff plan she proposed in 2019 may also serve as direct evidence. (Doc. No. 100 at 15). But deciding not to follow the 2019 layoff plan (i.e., deciding to eliminate Obergefell's position rather than following the plan to eliminate Molnar's) is the "employment decision." *See Scheick*, 766 F.3d at 530. The question is whether there is "direct evidence" showing Obergefell's age was the "'but for' cause" of that "business decision" not to follow the plan. *Id.* Accordingly, I reject her suggestion that the "business decision" itself may serve as evidence of causation – direct or circumstantial.

(as opposed to either years of service or a desire that [s]he leave the position voluntarily)." *Scheick.*, 766 F.3d at 531; *see also Rowan*, 360 F.3d at 548 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)) ("Since age and years of service are 'analytically distinct,' a decision based on years of service is 'not necessarily "age-based."'"). Because Copsey said nothing of Obergefell's age when discussing her succession plan in 2016 and 2019, those remarks do not directly show Copsey's intent when deciding to eliminate Obergefell's position and terminate her "could be nothing other than to discriminate on the basis of age." *Scott*, 182 F. App'x at 526. Therefore, Copsey's 2016 and 2019 "retirement" remarks are not direct evidence that Obergefell was terminated because of her age.

Second, even if Copsey expressed a desire to hire a "young star," this is not direct evidence that Obergefell was terminated because of her age. As the Sixth Circuit explained when concluding similar statements were not direct evidence of age discrimination, "a stated desire to 'attract young people ... says *nothing* about terminating older employees.'" *Pelcha*, 988 F.3d at 325-26 (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020)) (emphasis in *Miles*).

Finally, a reasonable jury could not conclude Obergefell was terminated because of her age from any evidence related to Copsey's alleged history of ageism against other WCC employees "on its own" without making any inferences. *Bledsoe*, 42 F.4th at 580. Therefore, no evidence offered to support this claim is "direct evidence."

### 2. *McDonnell Douglas* Analysis

Because Obergefell cannot prove her age discrimination claim by direct evidence, I now consider whether she can do so by circumstantial evidence.

"ADEA claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting framework." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020). "Under this framework, the employee first has the burden of proving a prima facie case of age discrimination; if

he is successful, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for taking the allegedly discriminatory action.  Finally, the employee bears the burden of proving that the employer's justification is pretext for discrimination." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014).

### i.    Prima Facie Burden

Generally, to satisfy her prima facie burden on a claim of age discrimination, the employee plaintiff must show:

> (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.

*Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).  But "[w]here an employee is laid off as part of a reduction-in-force (RIF), the fourth requirement is modified and . . . the plaintiff must present 'direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'"  *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (quoting *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 420-21 (6th Cir. 1999)) (omitting further citation and internal footnote omitted from *Thompson*).

Here, the parties' disputes center on the fourth element and include a challenge by Obergefell to whether her termination was part of a RIF.  Because the standard applied to the fourth element is modified if her termination was part of a RIF, that issue must be considered first.

"A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company."  *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).  In other words, "[a] RIF occurs when an employer eliminates an employee's position because of business considerations and does not replace that employee after her discharge."  *Thompson*, 985 F.3d at 522 n.6 (citing *Barnes*, 896 F.2d at 1465).

Obergefell does not dispute that her position was eliminated. Further, despite her repeated references to Copsey's alleged plan to replace her with Molnar, Obergefell does not assert she was replaced by Molnar or anyone else following her termination and cites no facts that would support such a claim. Instead, she contends no RIF occurred because there was a net increase in personnel during the same quarter that her position was eliminated. This is neither factually correct[8] nor legally relevant.[9] Because Obergefell sets forth no legal argument or relevant evidence to suggest her position was not eliminated because of business consideration or that she was replaced, I must conclude no genuine dispute of material fact exists on this point – she was terminated as part of a RIF. Therefore, she "must meet a heightened standard to prove [her] prima facie case [and] present 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out ... for discharge for impermissible reasons.'" *Pierson*, 749 F.3d at 536-37 (quoting *Barnes*, 896 F.2d at 1465).

---

[8] Obergefell alleges no RIF occurred because 52 individuals were "hired" by FRMC in the second quarter of 2020 – the same quarter she and 19 other employees were terminated due to budgetary concerns – which resulted in "an *increase* in force by 32 employees." (Doc. No. 120 at 15 (citing Doc. No. 119-1 at 7)). But the same report Obergefell cites for the "52" figure disproves this conclusion. The report states 133 individuals were "separated" during this quarter, and shows the "total number of full time personnel" was reduced by 35 and the "total number of part time personnel" was reduced by 46. (Doc. No. 119-1 at 6). In other words, while Obergefell is correct that the report states 52 individuals were hired at some point during the second quarter, her statement that the total number of personnel *increased* by 32 is not supported by the record evidence. Instead, the evidence shows a net *decrease* in force by 81 employees.

[9] Obergefell argues FRMC should have "save[d] [her] job rather than hiring 52 new employees." (Doc. No. 120 at 15). But she does not suggest any of these new hires arguably replaced her. Instead, she essentially argues no RIF may occur if the employer hires *any* new employees during the same quarter that it eliminates the positions of others. But that is not the law. *See, e.g., Wohler v. Toledo Stamping & Mfg. Co.*, 125 F.3d 856 (Table), 1997 WL 603422, at * 5 (6th Cir. 1997) ( "[I]t may be sensible in a force reduction to eliminate some positions, such as supervisory positions, while at the same time creating others."); *Williams v. Emco Maier Corp.*, 212 F. Supp. 2d 780, 748-85 (S.D. Ohio 2002) ("Surely, a company facing financial hardships may wish to eliminate certain positions in an effort to alleviate those difficulties, while still adding other positions in an effort to improve the company's operations."). Because none of the 52 new hires arguably replaced Obergefell, their hiring alone has no bearing on whether a RIF occurred.

Obergefell alleges she has introduced evidence in each of the three categories to meet her burden. But as "direct" evidence, she offers the same evidence I previously concluded was not "direct evidence." Therefore, I decline to repeat that analysis but will consider that evidence when discussing circumstantial evidence. *See, e.g., Pelcha*, 988 F.3d at 326. Accordingly, I now consider whether Obergefell has offered sufficient statistical evidence, circumstantial evidence, or both.

### a. Statistical Evidence

To prove her case by statistical evidence, Obergefell argues the RIF had "a disparate impact on older employees," (Doc. No. 100 at 13-14), because "11 of the 20 [terminated employees were] in the protected age class."[10] (*Id.*).

FRMC counters, in part, that this is a "rudimentary analysis," which fails to account for "the age of the employees who were retained after the RIF, which is necessary to undertake a sound statistical analysis." (Doc. No. 121 at 15). FRMC also introduces the following statistical evidence:

> The [twenty] employees impacted by the RIF ranged in age from 22 to 68; the average age was 45.5.
>
> … The average age of all FRMC employees before the staffing reductions (as of April 22, 2020) was 43.2. The average age of all FRMC employees immediately after the staffing reductions (as of June 27, 2020) was also 43.2.

(Doc. No. 115-2 at 4).

When faced with FRMC's statistical evidence accounting for the age of those retained employees, Obergefell argues FRMC is "playing games with the numbers." (Doc. No. 120 at 20). She offers no legal or mathematical argument to explain her position that the age of those retained

---

[10] In her motion for summary judgment, Obergefell asserted 25 employees were selected for termination and that 15 of those 25 were in the protected class. (Doc. No. 100 at 13-14). Because the figure itself is not relevant for purposes of this analysis, I need not discuss the discrepancy or the evidence she believes show that figure.

Additionally, to show statistical evidence exists to support her claim, Obergefell also renews her erroneous claim that FRMC had "a net increase of 32 employees." (Doc. No. 120 at 19). But as discussed above, this is neither factually correct nor legally relevant.

employees should not be considered. Instead, she contends FRMC's proffered statistical evidence "brings to mind Mark Twain's famous quote about the persuasive power of statistics to bolster weak arguments: 'There are three kinds of lies: lies, damned lies, and statistics.'" (*Id.* at 20) (internal footnote and citations omitted). This is an odd argument from a litigant seeking to prove her case by statistics. Nevertheless, Obergefell is correct to the extent that "their usefulness depends on all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977).

For statistical evidence to be probative in a discrimination case like this, "'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" *Barnes*, 896 F.2d at 1466 (quoting *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987)). In turn, to create an inference of discrimination, "'the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity.'" *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018) (quoting *Barnes*, 896 F.2d at 1466) (further citation omitted).

When considering statistical evidence, the Sixth Circuit has suggested "inferences of discrimination" may be made "where data are offered alongside analyses describing their statistical significance." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 526 (6th Cir. 2021) (citing *Peeples*, 891 F.3d at 635). But the Circuit has repeatedly rejected data offered without "analysis regarding the statistical significance" of that data. *Peeples*, 891 F.3d at 625; *see, e.g.*, *Thompson*, 985 F.3d at 526 (rejecting the statistical evidence offered in part because the plaintiff "has not provided any analysis explaining the statistical significance of the data she offers"); *Pio v. Bentler Auto. Corp.*, No. 21-1231, 2022 WL 351772, at *4-*5 (6th Cir. Feb. 7, 2022) (rejecting statistical evidence in the form of an affidavit from plaintiff's counsel stating the average age of eliminated employees and the average age

of retained employees because "it is not presented by an expert and is not accompanied by a statistical analysis.").

Here, Obergefell offers no statistical analyses or expert opinion but urges me to consider in isolation only the ages of only those were terminated as part of the RIF and to ignore all other data, including the average age of FRMC employees both before and after the RIF. But she "provide[s] no legal argument that [her] statistics are sufficient under this C[ircui]t's precedent." *Peeples*, 891 F.3d at 636. Indeed, they are not. Accordingly, I conclude the statistics she has offered are of no probative value. They do not show the RIF had a disparate impact on older FRMC employees.

### b. Circumstantial Evidence

Rejecting Obergefell's statistical evidence, I turn to the final method by which Obergefell may prove her prima facie case: circumstantial evidence. On this point in her briefing, Obergefell alleges she can prove her case by circumstantial evidence showing she was treated "less favorably than similarly situated younger employees," namely Molnar, Mock, Williams, and Kilgore. (Doc. No. 100 at 16-17; Doc. No. 120 at 18-19).

The Sixth Circuit recognizes that, in the case of a RIF, "a plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position as the plaintiff." *Barnes*, 896 F.2d at 1466. But a plaintiff cannot establish a prima facie case by merely "demonstrat[ing] that younger persons were retained in other jobs which the plaintiff was qualified to perform." *Id.* at 1465.

Construing Obergefell's arguments liberally, she contends she was treated less favorably than Molnar, Mock, and Williams because each remained employed in the WCC while Obergefell was terminated. In making this argument, Obergefell fails to acknowledge that only she and Copsey held

the "position" of full-time NP in the WCC.  (*See* Doc. No. 115-2).  While Molnar[11] performed

limited NP work as a PRN NP, Mock and Williams did not.  Further, none of these three individuals

were full-time employees like Obergefell.[12]

Because Obergefell sets forth no evidence from which a reasonable jury could conclude

Molnar, Mock, and Williams held the "same position" as herself, that they kept their "other jobs" is

not evidence showing Obergefell was singled out for discharge because of her age.  Relatedly,

contrary to Obergefell's suggestion, (Doc. No. 120 at 19), FRMC's decision not to fire one these

individuals and give Obergefell that individual's "other job" is not evidence that Obergefell was

singled out for termination because of her age.  *See, e.g., Barnes*, 896 F.2d at 1469 ("This Circuit has

clearly established that an employer has no duty under ADEA to permit an employee to transfer to

another position or to displace workers with less seniority when the employee's position is

eliminated as part of a work force reduction."); *Skalka*, 178 F.3d at 421 ("The plaintiff cannot

prevail merely by pointing to *other* positions for which she was qualified and claiming that the

employer should have allowed her to 'bump' the occupant of that position.").

---

[11] Obergefell also alleges Molnar was treated more favorably because, "prior to the alleged RIF, Copsey made sure that Molnar had an employment contract but did not obtain an employment contract for Obergefell.  Moore Dep., Doc. No. 53, PageID # 1595-1598."  (Doc. No. 120 at 19).  But as noted by FRMC, "the record evidence does not support [this] theory."  (Doc. No. 121 at 10).  The record evidence cited by Obergefell shows Molnar received a contract and that FRMC was working on finalizing Obergefell's contract when the pandemic hit.  (*See* Doc. No. 53 at 64-67).  Obergefell cites no record evidence indicating Copsey had any control in Obergefell's contract not being finalized prior to the pandemic.  Therefore, this cannot be considered as evidence of any disparate treatment by Copsey.

[12] Obergefell alleges, "Copsey admitted she created flexible positions for three younger Wound Care Center employees (Jenna Molnar, Jamie Mock, and Amy Williams), but did not create a flexible position for Obergefell."  (Doc. No. 120 at 18-19).  Obergefell sets forth no evidence to show Copsey "created" any position or had the authority to do so.  Beyond this, Obergefell also sets forth no evidence to support her suggestion that Copsey "created" those positions in the face of the RIF to shield them from it while not doing the same for Obergefell.  Accordingly, I must reject this theory as unfounded.

Unlike Molnar, Mock, and Williams, who remained in their existing positions, Obergefell alleges, "Moore treated the younger WCC secretary Kelly Kilgore better than Obergefell because he found her another job in the hospital. Obergefell Dep., Doc. No. 51, PageID # 1248." (Doc. No. 120 at 19).

"Although an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, the employer violates the ADEA when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination." *Ercegovich*, 154 F.3d at 351. A plaintiff alleging they were denied an opportunity to transfer because of age discrimination must show:

> 1) he or she is a member of a protected class; 2) at the time of his or her termination he or she was qualified for other available positions within the corporation; 3) the employer did not offer such positions to the plaintiff; and 4) a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination.

*Id.*

Obergefell does not cite this standard in her briefing and does not set forth evidence to arguably satisfy her burden on this mark. That is, the only "available position" she identifies is that which Kilgore was allegedly offered. (Doc. No. 51 at 192). Obergefell offers no evidence to show she was qualified for that position or was "sufficiently similarly-situated" to Kilgore to make her a proper comparator. *Ercegovich*, 154 F.3d at 353. Accordingly, I conclude Kilgore's transfer is not evidence that Obergefell was singled out for discharge because of her of age.

While Obergefell's proffered circumstantial evidence of disparate treatment does not satisfy her prima facie burden, my analysis does not end. Instead, as stated above, I will also consider whether the evidence Obergefell offered as "direct" is circumstantial evidence sufficient to satisfy her prima facie burden. This evidence includes that related to Copsey's alleged history of ageism

23

against other older WCC employees and Copsey's plan to replace Obergefell with Molnar upon Obergefell's retirement.

With respect to that evidence related to others, Obergefell first alleges, "During the time Copsey worked as the Clinical Manager and then as the Director of the Wound Care Center, she made derogatory age comments about older employees."  (Doc. No. 100 at 10; *see also* Doc. No. 120 at 16-17).  But the only evidence she offers that may be considered[13] is her claim that "Copsey told Obergefell that LPN Susan Pumphrey was 'too old' and 'not fast enough.'  Obergefell Dep., Doc. No. 51, Page ID # 1100." [14]  (Doc. No. 100 at 10 (citing Doc. No. 51 at 44)).

Beyond this remark about Pumphrey, Obergefell also claims Copsey had a "pattern of getting rid of older employees," asserting that "[d]uring the time Copsey was in management, five older employees in the protected age class (Susan Pumphrey, Linda 'Codi' [Burkett], Sharon Carbury, Erica Sharkey, and Lori Ross) left the Wound Care Center.  *Id.* at PageID # 2515-2516."  (Doc. No. 120 at 18; *see also* Doc. No. 100 at 10-11 (both citing Doc. No. 80-1 at 12-13)).  But the evidence Obergefell cites – Copsey's deposition at "PageID # 2515-2516" – does not support such

---

[13] In her briefing, Obergefell also alleges Copsey made two other allegedly ageist remarks about other individuals.  (*See* Doc. No. 100 at 10).  But the evidence she cites to show these remarks were made consist of one exhibit I concluded must be excluded from consideration, (Doc. No. 111-19), and portions of Copsey's deposition testimony wherein she specifically denies making these statements when asked by Obergefell's counsel.  (Doc. No. 80-1 at 16-19 and 26).  Neither Copsey's denials nor the excluded exhibit may be considered as evidence that those additional two remarks were made.  Accordingly, I decline to consider these alleged remarks further in the analysis.

[14] The record evidence cited does not entirely corroborate this assertion.  On the page cited by Obergefell, she testified, "But she has gotten several people fired.  One I remember, Sue, because she's old and slow."  (Doc. No. 51 at 44).  The next page of this deposition transcript contains Obergefell's testimony that, "Tonia had a habit of talking her mouth off, and she would tell people, 'I'm trying to get her out.  She's too old, and she's too slow.'"  (*Id.* at 45).  The remark "not fast enough" does not appear in the document cited.

a finding. Most notably, it does not show these individuals were in the protected age class.[15]

Instead, it includes the following exchange between Copsey and Obergefell's counsel:

> Q  Okay. So with the exception of Jill Wagner who you don't recall working in the Wound Care Center, all the names that I went through -- Susan Pumphrey, Linda Burkett, Sharon Carbury, Erica Sharkey and Lori Ross -- all of those individuals were over the age of 40; is that correct?
>
> A  Oh, I don't know their ages.
>
> Q  But you don't have any basis to dispute my statement that all of those employees were over the age of 40 and in the protected age class under the Age Discrimination Employment Act?
>
> A  Again, I don't know their ages.

(Doc. No. 80-1 at 12-13).

Even viewing the evidence set forth by Obergefell in the light most favorable to her and making all inferences in her favor, a reasonable jury could infer only Pumphrey was in the protected age class from the alleged "too old" comment. Obergefell has failed to set forth any evidence from which a reasonable jury could infer Copsey had a "*pattern* of getting rid of older employees." (Doc. No. 120 at 18) (emphasis added). The question remains whether Obergefell has set forth evidence showing Copsey "got rid of" *any* employee – that is, whether Copsey "got rid of" Pumphrey.

To make such a showing, Obergefell alleges Copsey "use[d] the FRMC's 2010 policy regarding the use of LPN's [Licensed Professional Nurses] to force Susan Pumphrey … out of the Wound Care Center in 2011[.]"[16] (Doc. No. 100 at 11). In support of this assertion, Obergefell sets

---

[15] The evidence cited also shows that only Sharkey and Ross left the WCC while Copsey was Director of the WCC. (*See* Doc. No. 80-1 at 12). Specifically, Copsey testified that Ross had transferred to another department. (*Id.*). Copsey stated she did not "remember the details of that" when asked if Sharkey was given "the option to resign or be terminated," but affirmed she had left the WCC. (*Id.*). Nothing was stated about either which could arguably reference their ages.

[16] Obergefell also alleges Burkett was an LPN who left the WCC because of this policy. Even if Obergefell had set forth evidence showing Burkett departed the WCC under these circumstances, Obergefell sets forth no evidence to suggest Burkett's age was ever an issue with Copsey or played any role in Burkett's departure from the WCC.

forth as evidence "Appendix 8." (Doc. No. 100 at 11 (citing Doc. No. 99)). But Appendix 8 consists of minutes from an April 13, 2010 FRMC Committee Resource meeting, the Committee's report of that meeting, and excerpts from the April 26, 2010 FRMC Board of Directors Annual Meeting where FRMC's 2010 policy regarding LPNs was discussed and explained. (Doc. No. 99). These materials do not name Copsey as an attendee of any of these meetings. They also make no reference to the WCC or Pumphrey. Finally, they contain nothing to suggest a department head, such as Copsey, would have authority to implement this 2010 policy in their department. In short, this is not evidence that Pumphrey left the WCC pursuant to the 2010 policy, let alone that Copsey had authority to implement this policy in the WCC and nefariously exercised that authority to "force out" Pumphrey.

In short, the only record evidence Obergefell has offered to show Copsey had a history of ageism against other WCC employees is the "too old" remark, which was made at some point before Obergefell was terminated.

Unlike her claim of Copsey's alleged history of ageism, she has set forth evidence showing Copsey had a plan to replace Obergefell with Molnar upon Obergefell's retirement. (*See* Doc. No. 100 at 15; Doc. No. 120 at 15-18). This evidence shows Copsey discussed this plan with Obergefell in 2016, (Doc. No. 51 at 170), and laid it out again to Meisler-McKillips in 2019, (Doc. No. 110-6 at 5), when seeking to hire "young star" Molnar as an NP in the WCC. (Doc. No. 53 at 51).

With this, I turn to whether Copsey's remarks, including the "too old" comment about Pumphrey, are sufficient to satisfy Obergefell's prima facie burden. In doing so, I note that the Sixth Circuit's has found the heightened RIF prima facie burden may be satisfied if "a plaintiff could show that the employer made statements indicative of a discriminatory motive . . . . The guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the

employer intentionally discriminated against the plaintiff because of age." *Barnes*, 896 F.2d at 1466. Obergefell's evidence does not clear this bar.

None of the four remarks identified were made in relation to Obergefell's termination or about her age. They were not made in close proximity to her termination but were scattered across many years with the last of these remarks made in September 2019 – more than six months before her April 2020 termination. Of the four remarks, only two related to Obergefell herself. While these two remarks discussed her retirement, they are not the red flag Obergefell purports them to be. That is, with these remarks, Copsey discussed Obergefell's eventual, not impending, retirement in the context of succession planning and made no suggestion that Obergefell *should* retire because of her age or for any other reason. Without more, these retirement-related remarks do not carry a discriminatory motive. *See, e.g., Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247-48 (6th Cir. 1997).

Considering the remarks identified in the light most favorable to Obergefell and drawing all inferences in her favor, a reasonable jury could not conclude Copsey chose to eliminate Obergefell's position because of her age. Obergefell has failed to satisfy her prima facie burden.

### ii.      Pretext

Even if Obergefell had satisfied her prima facie burden, her age discrimination claim would fail at the pretext stage. As discussed above, FRMC set forth the following reason to meet its step two burden:

> FRMC eliminated the positions of twenty employees in April, May, and June 2020 as a result of the immediate and serious financial impact of the COVID-19 pandemic. The COVID-19 pandemic had a particularly devastating impact on the WCC, resulting in low patient volume, a lack of work for Obergefell, and a pressing need for cost-saving.

(Doc. No. 115-1 at 17-18). Thus, the burden returns to Obergefell to show that reason was pretextual "—i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Obergefell does not meaningfully dispute that FRMC experienced financial problems because of the COVID-19 pandemic or that her position and others were eliminated because of those financial problems.  Still, she alleges FRMC's decision to conduct the RIF was pretextual because "the record evidence establishes that FRMC did not make reasonably informed and considered decisions before, during, and after it terminated her, thereby making its proffered RIF reason for terminating her insufficient to motivate its termination decision."  (Doc. No. 100 at 21; Doc. No. 120 at 24) (emphasis omitted).

With this, she identifies various decisions she believes FRMC could or should have made instead of terminating her (e.g., eliminating Copsey's directorial position, terminating Molnar and giving Obergefell her job, using COVID-19 relief money to save her job, hiring no other employees in the quarter it implemented the RIF eliminating her position).  But in the course of proposing each of these alternatives, she fails to acknowledge "[t]he ADEA was not intended as a vehicle for judicial review of business decisions."  *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982) (further citation omitted).

As the Sixth Circuit stated in *Norbuta v. Loctite Corp.*, 1 F. App'x 305 (6th Cir. 2001):

> When an employer implements a RIF, the unfortunate fact is that someone has to go.  It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized…. [A plaintiff-employee] must provide evidence not that [the employer] could have made a business decision that others might think more fair, but that [the employer] made the decision to terminate him because of his membership in a protected class.

1 F. App'x at 314-15 (citations omitted).  In short, "the business decision of [the employer] to eliminate the [plaintiff-employee's] position … should not be questioned by a court in the absence of evidence of an impermissible motive, even if it was not the most cost effective decision."  *Gulley v. Cnty. of Oakland*, 496 F. App'x 603, 608 (6th Cir. 2012).  *See also Gatch v. Milacron, Inc.*, 111 F. App'x 785, 791 ("And even if the RIF was not entirely necessary from a business standpoint, it

unquestionably occurred, resulting in the elimination of 38 jobs, furloughs, reduction of overtime and other expense reductions. This evidence simply does not permit a finding that age discrimination rather than business judgment motivated the RIF or Gatch's demotion.").

With this, I reject all of Obergefell's challenges to FRMC's business decisions unrelated to a possible discriminatory motive and turn to the question of whether Obergefell has offered evidence showing she was terminated because of her age. To make this required showing, Obergefell argues: (1) Copsey chose to eliminate Obergefell's position in the otherwise legitimate RIF to disguise her discriminatory motive; and (2) the RIF was implemented without an objective plan and had a disparate impact on employees in the protected age class. To support these two arguments, Obergefell relies on the same evidence discussed above. Both arguments fail.

First, even if Obergefell could satisfy her prima facie burden based on Copsey's statements, she cannot satisfy her burden on pretext. Copsey's statements were isolated, were not unambiguously ageist, and were not made in relation to the decision to select Obergefell's position to be eliminated through the RIF. *See, e.g., Miles*, 946 F.3d at 896 ("If these are discriminatory remarks, they can only serve as pretext if a person in a position to influence the alleged employment decision made them and they are not so isolated or ambiguous as to be nonprobative.") (internal quotation marks and further citation omitted); *Blizzard*, 698 F.3d at 287 ("[B]ecause the discriminatory remarks were unrelated to the decision to dismiss [the plaintiff] from her employment, they do not constitute evidence of discrimination."); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements by decisionmakers unrelated to the decisional process itself can not suffice to satisfy the plaintiff's burden of demonstrating animus.") (internal alterations and further citation omitted).

Second, as discussed above, the statistical evidence Obergefell offers is not probative and does not show the RIF had a disparate impact on older employees. Therefore, all that remains is

Obergefell's challenge to FRMC's alleged lack of an objective plan for the RIF.  (Doc. No. 120 at

21).  With this, she faults FRMC's failure to "develop a plan containing a list of objective factors that

would be used to select the employees for the RIF."  (*Id.*).  To show this alleged shortcoming is

pretextual, Obergefell relies on *Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007), which states:

"'a lack of evidence regarding a company's objective plan to carry out a reduction in force' is a

'factor[ ] that might indicate that an alleged reduction in force is pretextual.'"  505 F.3d at 533

(quoting *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 374 (6th Cir. 1999)).

 Contrary to Obergefell's suggestion, *Blair* does not stand for the position that objective *factors*

to select employees are required to find an "objective plan" exists.  Instead, the *Blair* court found

there was no objective plan in that case because there was "no blueprint for this reduction," – "the

shedding of employees appears to have been chaotic, occurring in fits and starts" over the course of

two years.  *Id.* at 521, 533-34.  Beyond this, the *Blair* court concluded, "This lack of an objective

plan, coupled with [the plaintiff]'s circumstantial evidence of age discrimination, would permit a

reasonable fact-finder to conclude that [the employer]'s proffered nondiscriminatory reason for

terminating [the plaintiff] was a pretext for discrimination."  *Id.* at 534.

 Here, even if FRMC's plan was not sufficiently "objective," Obergefell has identified no

circumstantial evidence of age discrimination from which a reasonable jury could infer the RIF was

implemented in a discriminatory manner.  The purported lack of an objective plan alone does not

show her termination in the course of the RIF was pretextual.

 I appreciate that Obergefell feels FRMC should have cut costs in other ways and used its

remaining financial resources to save her job.  I also acknowledge that she feels Copsey used the RIF

as an opportunity to terminate Obergefell.  But ultimately, the question is whether Obergefell was

selected for discharge because of her age.  Obergefell has failed to offer evidence showing that was

the case.  That is, a reasonable jury viewing the evidence in the light most favorable to Obergefell

and drawing all inferences in her favor could not believe Obergefell's full-time NP position was eliminated and she was terminated because of her age. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original). Therefore, FRMC's motion for summary judgment is granted as to Obergefell's age discrimination claims, and Obergefell's motion for summary judgment of those claims is thus necessarily denied.

### B.    AIDING AND ABETTING AGE DISCRIMINATION

Obergefell next asserts a claim of aiding and abetting age discrimination against each individual Defendant pursuant to Ohio Revised Code § 4112.02(J).  (Doc. No. No. 1 at 13).

Defendants allege they are entitled to summary judgment of this claim because it is a derivative claim of the Ohio age discrimination claim for which FRMC is entitled to summary judgment.  (Doc. No. 115-1 at 26).  In support, Defendants cite *Weinrauch v. Sherwin-Williams Co.*, No. 1:18-cv-1696, 2019 WL 3007031 (N.D. Ohio July 10, 2019), which states: "Where a court finds that a defendant is entitled to summary judgment on the underlying claims of discrimination and retaliation, the court must also necessarily grant summary judgment on the claim of aiding and abetting those claims."  2019 WL 3007031, at *14.

Obergefell does not dispute that this is an accurate statement of the law but asserts "the individual Defendants in Obergefell's case cannot rely on this case to avoid liability for Obergefell's aiding and abetting claims because, as discussed *supra* at 12-16, FRMC is **not** entitled to summary judgment on Obergefell's Ohio age discrimination claim."  (Doc. No. 120 at 30) (emphasis in original).

For the reasons discussed above, FRMC is entitled to summary judgment on the underlying claim of age discrimination.  Accordingly, the individual Defendants must be granted summary judgment of the claims of aiding and abetting those discrimination claims.

C.     **WRONGFUL DISCHARGE**

Obergefell asserts two claims for wrongful discharge against FRMC.  The first under a theory of breach of an implied contract, and the second under the doctrine of promissory estoppel. (Doc. No. 1 at 15-17).  Only FRMC moves for summary judgment as to these claims, asserting it is entitled to summary judgment of the wrongful discharge claims because Obergefell's employment was "at-will."  (Doc. No. 115-1 at 27-30).

Pursuant to Ohio's employment-at-will doctrine, either the employer or the employee "may terminate the employment relationship for any reason which is not contrary to law."  *Mers v. Dispatch Printing Co.*, 483 N.E.2d 150, 153 (Ohio 1985).  But the Supreme Court of Ohio has "carved out two exceptions to the employment-at-will doctrine: (1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee."  *Wright v. Honda of Am. Mfg., Inc.*, 653 N.E.2d 381, 384 (Ohio 1995) (citing *Mers*, 483 N.E.2d at 154-55).

In support of its motion for summary judgment, FRMC first sets forth evidence of Obergefell's at-will employment.  (Doc. No. 115-1 at 27-28).  This evidence consists of numerous documents showing Obergefell repeatedly acknowledged she was an at-will employee over the course of her employment at FRMC.[17]  Specifically, these documents show Obergefell last completed this Annual Acknowledgement on October 18, 2019, (Doc. No. 113-2 at 2), affirming:

> I understand that my employment is "at-will", and therefore, just as I may terminate my employment relationship with Firelands Regional Health System any time for any reason, Firelands reserves the right to terminate my employment within its sole discretion.  In accordance with applicable laws.  Absolutely no one except the President and Chief Executive Officer may change this relationship, and then only in writing.

---

[17] *See* Doc. No. 113-1 at 7; Doc. No. 113-2; Doc. No. 113-3 at 3-6; Doc. No. 113-4 at 5-7; Doc. No. 113-5 at 5-7; Doc. No. 113-6 at 5-7; Doc. No. 113-7 at 3-5; and Doc. No. 113-8 at 3-5.  *See also* Doc. No. 51 at 37-38, 48-61.

(Doc. No. 113-8 at 4-5).  Obergefell did not recall ever having received anything in writing from a

president or CEO of FRMC changing the nature of her employment.  (Doc. No. 51 at 213).

For her part, Obergefell does not dispute that her employment was at-will.  But she alleges

both the implied contract and promissory estoppel exceptions apply, relying on "both FRMC's

policies and on representations of [job] security which Tonia Copsey made to her."  (Doc. No. 120

at 33).  Specifically, to defeat summary judgment on these claims, she identifies the following:

> 1.) "FRMC's Reductions In Force and Severance Pay Policy which states: FRMC 'strives to avoid reductions in workforce whenever possible,' '[r]eductions in force will follow an orderly procedure' outlined in the policy and that in making a decision to eliminate a position or reduce the workforce, management will consider specific guidelines.  These guidelines include 'promote fair and respectful treatment of employees by considering, in making their decisions: the employee's knowledge, skills and abilities, performance evaluations for the last year or two, records of performance improvement given to the employee within the last year, and length of service when other criteria are relatively equal.'," (Doc. No. 120 at 33 (quoting Doc. No. 94)) (emphasis removed);

> 2.) Copsey's 2016 assurance that Obergefell's "job was safe" made in response to Obergefell's concern regarding Copsey's plan to hire Molnar after she got her NP degree, (id. at 33 (citing Doc. No. 51 at 173-74)[18]) (emphasis removed);

> 3.) Copsey's statements in Obergefell's 2016, 2017, and 2018 annual evaluations such as ""I look forward to working with you for many years to come" and "Laurie continues to be a valued member of the wound care department as well as the entire Firelands organization.," (id. at 120)[19] (emphasis removed);

> 4.)  Copsey's September 2019 statement in the justification statement to Meisler-McKillips that, in the event of a layoff, the new position would be laid off first.  (Id. at 33-34 (citing 110-6)) (emphasis removed).

---

[18] Obergefell's quoted language does not appear in her deposition, but similar language does appear on the pages cited.  (See Doc. No. 51 at 173-74).  As such, any error is harmless.

[19] In her brief, Obergefell quotes these evaluations and cites to Exhibit letters and page numbers. (Doc. No. 120 at 33).  But it does not appear that she introduced these evaluations into the record. At the very least, she has failed to direct me to any portion of the record containing these statements.  The only of these evaluations I was able to locate was introduced by Defendants.  (See Doc. No. 113-9).  Nevertheless, none of the statements quoted from these evaluations are "specific promise of job security," and Obergefell introduces no evidence to suggest she relied on any of these specific statements to her detriment.  Because these statements would not create a genuine issue of material fact if they had been introduced, the failure to do so is a moot point.

### 1.        Breach of Implied Contract

Ohio law recognizes that "[e]mployment manuals may constitute binding contracts, but 'an employee who asserts the existence of an implied contract must prove the existence of each element necessary for the formation ... of a contract, including, offer, acceptance, consideration, and mutual assent.'" *Hines v. Humana Ins. Co.*, 689 F. Supp. 3d 516, 538 (S.D. Ohio 2023) (quoting *Staschiak v. Certified Logistics*, 2016-Ohio-897, 60 N.E.3d 824, 828 (Ohio Ct. App. 2016)) (further citation omitted); *see also Helle v. Landmark, Inc.,* 472 N.E.2d 765, 773 (Ohio Ct. App. 1984) ("When such oral or written modifications of the original employment contract satisfy the paradigm elements essential to contract formation—*i.e.,* offer, acceptance, consideration—binding obligations arise.").

"[T]he employee's belief that the handbook affords him contractual rights does not mean that it does unless the employer intends it to do so.  As in all contracts, express or implied, both parties must intend to be bound." *Clayton v. Cleveland Clinic Found.*, No. 101854, 2015 WL 1851517, at *2 (Ohio Ct. App. Apr. 23, 2015).  "'Absent mutual assent * * * a handbook becomes merely a unilateral statement of rules and policies which create no obligation and rights.'" *Id.* (quoting *Tohline v. Cent. Tr. Co., N.A.*, 549 N.E.2d 1223, 1227 (Ohio Ct. App. 1988)); *see also Bartlett v. Daniel Drake Mem'l Hosp.*, 599 N.E.2d 403, 406 (Ohio Ct. App. 1991) (noting *Mers* did not disturb "the generally accepted conclusion that items such as employer handbooks, company policy or oral representations do not create employee rights which alter the 'termination for any reason' terms for discharge under the at-will situation unless the parties" mutually intend to alter those terms).  Consistent with this, "Ohio courts have also long held … that employee handbooks that contain disclaimers either explicitly stating that the handbook does not constitute a contract or provides the employer unilateral ability to alter the terms of the handbook negate any inference of a contractual obligation between the employer and employee." *Hines*, 689 F. Supp. 3d at 538-39 (citing cases).

FRMC alleges it is entitled to summary judgment on this claim because "[t]he disclaimer included in the Human Resources Policy Manual expressly denounces any intention to create a contract." (Doc. No. 115-1 at 28). As evidence, it introduces the same acknowledgements it set forth to show Obergefell's at-will employment, which also contain an express disclaimer affirming:

> I understand that the policies and rules contained in the Human Resources Policy Manual are subject to change from time to time and that the manual is not intended to be, nor should it be regarded as an employment contract. I recognize that Firelands may add to, delete, and/or revise policies.
>
> …
>
> I understand that my employment is "at-will", and therefore, just as I may terminate my employment relationship with Firelands Regional Health System any time for any reason, Firelands reserves the right to terminate my employment within its sole discretion. In accordance with applicable laws. Absolutely no one except the President and Chief Executive Officer may change this relationship, and then only in writing.

(Doc. No. 113-8 at 3-4; *see also* Doc. No. 113-2; Doc. No. 113-3 at 3-6; Doc. No. 113-4 at 5-7; Doc. No. 113-5 at 5-7; Doc. No. 113-6 at 5-7; and Doc. No. 113-7 at 3-5).

Obergefell responds by arguing, "such disclaimers can be negated by representations of job security." (Doc. No. 120 at 35). In support, Obergefell cites: *Helle v. Landmark, Inc.,* 472 N.E.2d 765 (Ohio Ct. App. 1984) and *DeSanzo v. Titanium Metals Corp.*, 351 F. Supp. 2d 769 (S.D. Ohio 2005). (*Id.*). But only *DeSanzo* is arguably on point.[20] There, the employee signed an acknowledgement that: "This offer, if accepted, will create an employment-at-will relationship between you and [the employer]. It is not intended nor should it be construed as a contract of continued employment."

---

[20] While *Helle* involved disclaimers, it did not involve the type of disclaimer at issue here explicitly evincing the employer's intent *not* to be bound by contract. *Helle* also did not involve "representations of "job security," but dealt with whether an implied contract was created for receipt of severance benefits in exchange for working until the employer's facility closed. 472 N.E.2d at 772 ("[T]his case does *not* involve the characteristic dispute over *termination,* usually the focal point of litigation under the employment-at-will doctrine. … This case, by contrast, arises from Landmark's refusal to pay severance benefits, a form of deferred compensation for continued service, and thus the issue presently before us entails an analysis based upon contemporary *contract* theory.").

351 F. Supp. 2d at 773.  But the court noted this acknowledgement "does not indicate that modifications to the terms of [the employee]'s employment must be made in writing."  *Id.*

In contrast, Obergefell repeatedly acknowledged that: "Absolutely no one except the President and Chief Executive Officer may change this relationship, and then only in writing." (Doc. No. 113-8 at 4).  Beyond this, the acknowledgment in *DeSanzo* was signed *before* any statement of job security was made.  *See* 351 F. Supp. 2d at 773-74.  Obergefell's last acknowledgement was signed approximately one month after Copsey's last purported statement of job security.  (*Compare* Doc. No. 110-6 *with* Doc. No. 113-2).

Even if Ohio law recognized a case where oral statements could negate an explicit disclaimer,[21] Obergefell's would not be that case, as she has set forth no record evidence to show she *or* FRMC held the belief that any policy or oral representation modified her employment at-will status and granted her contractual employment-termination rights.  Instead, the evidence shows Obergefell repeatedly acknowledged she was an employee at-will; last doing so weeks *after* Copsey proposed the 2019 layoff plan.  (*Compare* Doc. No. 110-6 *with* Doc. No. 113-2 at 2).  Even if Obergefell had offered evidence showing she believed her at-will employment had been modified, Obergefell sets forth no evidence showing FRMC shared any such belief and mutually assented to modifying the employment at-will relationship.  Therefore, I must conclude no genuine issue of material fact exists and grant FRMC's motion for summary judgment of this claim.

---

[21] Beyond the factual differences identified, I also note that the *DeSanzo* court did not meaningfully analyze the implied contract claim on its own merits.  *See* 351 F. Supp. 2d at 777-80.  That is, while it cited the standard for such an implied contact claim, it did not apply it by considering whether record evidence existed from which a reasonable jury could infer the elements of contract formation had been met.  Instead, it summarily made this conclusion and analyzed both claims under the promissory estoppel standard.  Had it analyzed these claims separately, only the promissory estoppel claim may have survived.

2.      **Promissory Estoppel**

"[T]he doctrine of promissory estoppel is applicable and binding to oral employment-at-will agreements when a promise which the employer should reasonably expect to induce action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise." *Mers*, 483 N.E.2d at 155. "The test . . . is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." *Id.*

In *Helmick v. Cincinnati Word Processing, Inc.*, 543 N.E.2d 1217 (Ohio 1989), the Supreme Court of Ohio "shed further light on the nature of a promise that can give rise to a promissory estoppel exception to the employment-at-will doctrine." *Wing v. Anchor Media, Ltd. of Texas*, 570 N.E.2d 1095, 1098 (Ohio 1991). There, it clarified that, "[s]tanding alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship. [But a] demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine." *Helmick*, 543 N.E.2d at 1213, syl at ¶3.

FRMC contends it is entitled to summary judgment on Obergefell's promissory estoppel claim because no statement made in FRMC's policies or by Copsey are "specific promises of job security." (Doc. No. 115-1 at 29-30).[22] Obergefell acknowledges that "the cases cited by Defendants certainly suggest that an employer's generalized statements about being fair treatment during layoffs and promises of future benefits will not support a promissory estoppel claim." (Doc.

---

[22] In support, FRMC included the following citations and parentheticals: "*Allen v. Ethicon, Inc.*, 919 F. Supp. 1093, 1099-1101 (S.D. Ohio 1996) (handbook policies were not specific promises upon which plaintiff could rely); *Clayton*, 2015-Ohio-1547, at ¶ 20 (handbook provisions were not specific promises of job security and thus could not be reasonably relied upon)." and "*Lake v. Wolff Bros. Supply, Inc.*, 9th Dist. Cuyahoga No. 63959, 1993 WL 462866, *6 (Nov. 10, 1993) (representations that employee "will have this job forever" and "will have a job until you retire" not sufficient to alter at-will employment relationship)." (Doc. No. 115-1 at 29-30).

No. 120 at 34). But she maintains that Copsey's 2019 statement regarding the layoff plan may still be considered a "specific promise of job security." (*Id*.). Obergefell suggests this statement was a promise to "Obergefell that she did not need to worry about losing her job in a layoff. In reliance on this promise, Obergefell decided not to look for another job." (*Id*.). But even if Obergefell had introduced evidence showing she knew of this layoff plan,[23] she introduces no record evidence to support her conclusory assertion that "[i]n reliance on this promise, Obergefell decided not to look for another job."[24] (*Id*.). Without such evidence of detrimental reliance, her promissory estoppel claim cannot survive summary judgment.

---

[23] Seemingly to show she knew of the 2019 layoff plan before her termination, Obergefell alleges, "Copsey shared a Q&A handout she had given to Obergefell and the other WCC employees in which she explained that in the event of a layoff in the WCC, Molnar would be laid off first, not Obergefell. Meisler-McKillips Dep., Doc. No. 60, PageID # 2116- 2119, Exhibit 7." (Doc. No. 120 at 34) (emphasis removed). But neither Meisler-McKillips's deposition, (*see* Doc. No. 60 at 41-44), nor Exhibit 7 support such a finding. (Doc. No. 110-6). Exhibit 7 contains: (1) the document with the 2019 layoff plan that is formatted as a "Q &A," wherein Copsey answers the questions about the requested position, (*id.* at 4-5); and (2) an email exchange between Copsey and Meisler-McKillips – subject "PTO questions from staff." (*Id.* at 2-3, 6-7). The first email in this exchange is from Copsey and states, "Here are the questions/comments that my staff has come up with regarding PTO draft policy." (*Id.* at 7). The second is Meisler-McKillips's response: "Thanks Tonia…comments are attached!" (*Id.*). The third contains Copsey's first reply to Meisler-McKillips email and states, in part, "Thank you, I will share with my staff." (*Id.*). In other words, though Copsey asserted she would "share" something with her staff in this exchange, that something was not the Q&A answered by Copsey herself. Instead, it was Meisler-McKillips's comments to the WCC staff members' questions about the PTO draft policy.

[24] While Obergefell cites no record evidence of reliance on any of Copsey's statements, including the 2019 layoff plan, the evidence she cites in relation to her other claims is instructive and refutes her conclusory allegations of reliance. First, in the portion of Obergefell's deposition she cites in support of her age discrimination claim, Obergefell outlined the same 2016 conversation wherein Copsey purportedly told Obergefell of her plan to hire Molnar and that Obergefell's "job was safe." (Doc. No. 51 at 170). But Obergefell recalled her reaction at the time was: "And I went, 'Oh, boy. I'm the next one. In three years I'm going to be gone.'" (*Id.*). Relatedly, immediately preceding the portions of her deposition she cites to support her IIED claim, (*see* Doc. No. 120-1 at 3 (citing Doc. No. 170 at 214-18), the following exchange occurred:

> Q Do you have any information or personal knowledge that Tonia was knowingly lying to you at the times she told you that your job was secure?

> A I never believed her.

(Doc. No. 170 at 213).

### D.      FRAUD AND MISREPRESENTATION

In the Complaint, Obergefell alleges a claim of fraud based on alleged promises regarding

continued employment contained in FRMC policies and made by Copsey.[25]  (Doc. No. 100 at 27-

28).

To succeed on a claim of fraud, a plaintiff must show:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b)
> which is material to the transaction at hand, (c) made falsely, with knowledge of its
> falsity, or with such utter disregard and recklessness as to whether it is true or false
> that knowledge may be inferred, (d) with the intent of misleading another into
> relying upon it, (e) justifiable reliance upon the representation or concealment, and
> (f) a resulting injury proximately caused by the reliance.

*Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083 (Ohio 1991).

Defendants assert they are entitled to summary judgment because Obergefell cannot

establish any of these elements.  (Doc. No. 115-1 at 30-31).  In support, they first incorporate their

promissory estoppel and implied contract arguments to argue no FRMC policy gives rise to a claim

---

[25] In her motion for summary judgment, Obergefell first introduces a statement by Normington-Slay
to support her fraud claim.  (Doc. No. 100 at 27-28).  But as Defendants correctly state in their
opposition brief, "Fed. R. Civ. P. 9(b) requires a plaintiff to plead fraud with particularity, and in the
Complaint: 1) specify the allegedly fraudulent statements; 2) identify the speaker; 3) plead when and
where the statements were made; and 4) explain what makes the statements fraudulent. *Ross v.
PennyMac Loan Servs.*, LLC 761 Fed. App'x 491, 493-494 (6th Cir. 2018), quoting *Republic Bank and Tr.
Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012)." (Doc. No. 121 at 22).  Because
Obergefell did not seek to amend her Complaint to add properly plead a claim of fraud based on
this statement by Normington-Slay, it is not included within the scope of her properly-pled fraud
claim.  Accordingly, she is not entitled to summary judgment on this unpled claim.

Similarly, while she introduces this statement in her opposition brief, (Doc. No. 120 at 36), it is well-
settled that a party cannot "expand its claims to assert new theories … in response to summary
judgment."  *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing cases).
Therefore, I conclude she cannot use this new theory to defeat Defendants' motion for summary
judgment.  Even if I could consider this statement, it would not allow this claim to survive summary
judgment because she has failed to offer evidence showing the elements are satisfied with respect to
this statement.  For example, Obergefell sets forth no record evidence from which a reasonable jury
could agree with her conclusory assertion that, "Obergefell relied on Normington-Slay's false
promise in deciding to remain in her position to her detriment."  (Doc. No. 120 at 36).

of fraud.  Obergefell does not dispute this point.  Accordingly, I grant summary judgment of any fraud claim based on FRMC's policies.

Defendants next offer multiple arguments to show why Obergefell's claim must fail with respect to any statement made to Obergefell regarding job security.  In part, they argue "Obergefell cannot demonstrate justifiable reliance on alleged pre-pandemic assurances of job security under these drastically different circumstances."  (Doc. No. 115-1 at 31).  Obergefell does not meaningfully respond to this argument.  Instead, she maintains Copsey's statements of job security, which she cited in support of her wrongful termination claims can give rise to her claim of fraud.  (Doc. No. 120 at 36-37).

But as discussed above, Obergefell fails to set forth any evidence to support her conclusory assertions that: (1) "Obergefell relied on Copsey's false representations in deciding to remain in her position;" and (2) "In reliance on this promise [in the 2019 layoff plan], Obergefell decided not to look for another job."[26]  (Doc. No. 120 at 34).  Without such evidence, her claim of fraud based on any statement by Copsey must fail as a matter of law.

### E.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Obergefell's final claim is that of intentional infliction of emotional distress, which she asserts against all Defendants.  (Doc. No. 1 at 19).  Both Obergefell and FRMC move for summary judgment of this claim.

To succeed on a claim of intentional infliction of emotional distress, the plaintiff must show:

(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress.

---

[26] As discussed above, the record evidence suggests Obergefell did not rely on Copsey's representations of job security.  Further, Obergefell also fails to offer evidence showing she knew of the 2019 layoff plan before this litigation.

*Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994).  When determining whether conduct is "extreme or outrageous," as required by the second element, the Supreme Court of Ohio has looked to § 46 comment d of the Second Restatement of Torts, which states:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671-72 (Ohio 1983).

"To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Godfredson*, 173 F.3d at 376 (alterations and further citation omitted).  And "Ohio places a particularly high bar on 'extreme and outrageous' conduct in the employer-employee relationship." *Culler v. Exal Corp.*, 193 F. Supp.3d 850, 852 (N.D. Ohio 2016). "When a plaintiff asserts intentional infliction of emotional distress related to an underlying claim of wrongful termination, the employer's conduct 'does not rise to the level of "extreme and outrageous conduct" without proof of something more'—even when the termination was based on discrimination." *Conrad v. U.S. Bank Nat'l Ass'n*, 391 F. Supp. 3d 780, 792 (S.D. Ohio 2019) (quoting *Godfredson*, 173 F.3d at 376).

Because of Ohio's "exceedingly narrow" definition of "Outrageous!", "courts have [even] dismissed intentional infliction of emotional distress claims involving significantly severe conduct. [*Wolfe v. Thermo Fischer Sci., Inc.*, 2009 WL 1255023, at *2 (S.D. Ohio May 4, 2009)] (finding an employer's sexually-charged remarks, false charge of sexual harassment and false imprisonment of the plaintiff for four hours with no food or water while interrogating, intimidating, harassing[,] and embarrassing her insufficiently extreme or outrageous)." *Culler*, 193 F. Supp. 3d at 852.

Here, FRMC asserts it is entitled to summary judgment of Obergefell's IIED claim because:

> Obergefell does not proffer evidence to support her IIED claim beyond that supporting her age discrimination claim. When asked to describe the basis for her IIED claim, Obergefell cited FRMC's alleged failure to follow its layoff policy and the individual Defendants' failure to investigate the basis for her termination, testifying, "All the people mentioned in here I believe knew what was going to happen. They all – and nobody did anything to stop it." (Doc. 51, PageID 1271.)

(Doc. No. 115-1 at 33). In response, Obergefell contends the evidence giving rise to her IIED claim consists not only of that supporting her age discrimination claim, but "also includes the individual Defendants' conduct which is the basis for my other claims for aiding and abetting discrimination, wrongful discharge based on promissory estoppel, wrongful discharge based on implied contract, and fraud and misrepresentation." (Doc. No. 120 at 38 (citing Doc. No. 51 at 214-18 and Doc. No. 120-1 at 3)).

As discussed above, the evidence Obergefell has offered does not show any Defendant engaged in tortious conduct, let alone conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager*, 453 N.E.2d at 671. While I appreciate that Obergefell feels that terminating her employment after 12 years during a pandemic is "outrageous," none of the conduct alleged falls into Ohio law's "exceedingly narrow" definition of "Outrageous!" *Culler*, 193 F. Supp. 3d at 852. Therefore, I must conclude no genuine dispute of fact exists and grant FRMC summary judgment of Obergefell's IIED claim.

## V.    CONCLUSION

There is no dispute that Obergefell was an exemplary employee in the WCC.  But there is also no genuine dispute that the COVID-19 pandemic caused financial hardship to FRMC, which required it to make difficult decisions.  While I sympathize with Obergefell, a reasonable jury viewing the evidence in the light most favorable to her and drawing all reasonable inferences in her favor could not conclude her termination violated state or federal law.  Further, nothing surrounding her termination gave rise to cognizable claims of breach of implied contract, promissory estoppel, fraud, or IIED.  Accordingly, for the reasons stated above, I must grant Defendants' motion and enter summary judgment in their favor on all claims.  (Doc. No. 115).  In turn, Obergefell's partial motion for summary judgment is denied.  (Doc. No. 100).  With this, I deny Obergefell's outstanding motions for hearings and conferences, (Doc. Nos. 124, 130, 131, and 132), and close this case.


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge